1  ROBBINS GELLER RUDMAN
     & DOWD LLP
2  JAMES I. JACONETTE (179565)
   DANIELLE S. MYERS (259916)
3  TRICIA L. McCORMICK (199239)
   JUAN CARLOS SANCHEZ (301834)
4  655 West Broadway, Suite 1900
   San Diego, CA  92101
5  Telephone:  619/231-1058
   619/231-7423 (fax)
6  jamesj@rgrdlaw.com
   dmyers@rgrdlaw.com
7  tricia@rgrdlaw.com
   jsanchez@rgrdlaw.com
8
   Lead Counsel for Lead Plaintiff
9
                    UNITED STATES DISTRICT COURT
10
                  CENTRAL DISTRICT OF CALIFORNIA
11
                        SOUTHERN DIVISION
12

13  In re YOGAWORKS, INC.          )  Master File No. 2:18-cv-10696-CJC-SK
    SECURITIES LITIGATION          )  (Consolidated with 2:19-cv-00970-CJC-
14  ─────────────────────────────  )  SK)
                                   )
15  This Document Relates To:      )  CLASS ACTION
                                   )
16      ALL ACTIONS.               )  CONSOLIDATED CLASS ACTION
                                   )  COMPLAINT FOR VIOLATION OF
17  ─────────────────────────────  )  THE FEDERAL SECURITIES LAWS
                                      
18                                    DEMAND FOR JURY TRIAL

19

20

21

22

23

24

25

26

27

28

Cases\4850-3151-9383.v1-5/21/19

Lead Plaintiff Inter-Local Pension Fund GCC/IBT ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint the following upon knowledge with respect to Lead Plaintiff and Lead Plaintiff's own acts, and upon facts obtained through an investigation conducted by Lead Plaintiff's counsel, which included, among other things: review and analysis of, relevant filings made by YogaWorks, Inc. ("YogaWorks" or the "Company") with the United States Securities and Exchange Commission (the "SEC"), Company releases, conference calls, public statements issued by defendants, media reports, analyst reports, industry reports and consultation with persons familiar with Yogawork's business. Lead Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION & OVERVIEW

1.     This is a federal securities class action on behalf of all persons and entities, other than defendants, who purchased YogaWorks common stock pursuant and/or traceable to the Company's initial public offering that commenced on or about August 10, 2017 and closed on August 16, 2017 (the "IPO"), seeking to recover compensable damages caused by defendants' violations of the Securities Act of 1933 (the "1933 Act") (the "Class").

2.     YogaWorks started as a single yoga studio in Santa Monica in 1987. As of July 2014, when it was acquired by private equity firm Great Hill Partners (defined herein), YogaWorks had 29 studios. Great Hill Partners nearly doubled the number of studios in just three years, and took the Company public in an attempt to exit its investment. During that period of time, Great Hill Partners replaced the YogaWorks C-Suite, established the Board of Directors with its employees, CEO and two "independent" directors, and implemented extensive cost-cutting measures that reduced pay and eliminated positions across the organization. Studio and regional managers had to make choices between quality staffing and management and keeping

- 1 -

1   studios clean.  Class quality and customer experience declined as a result of disruption
2   and other changes from the aggressive cost-cutting, and so too did visits to many of
3   the studios.  The business and financial metrics suffered as a result.

4       3.       YogaWorks started selling class packages, which cost more than monthly
5   memberships, to increase cash flow in advance of the IPO in an attempt to build a
6   pipeline of studio acquisitions.  The studios acquired were not the profitable studios
7   YogaWorks added before being acquired by Great Hill Partners.  Financial metrics
8   continued to decline.  Within a year of the IPO, the Company was privately suffering
9   from sequential and year-over-year declining measures of revenue, profitability and
10  studio visits.

11      4.       YogaWorks filed its draft registration statement on Form S-1 with the
12  SEC on April 18, 2017.  With its second quarter results in the books, on July 17, 2017,
13  defendant Chang, on behalf of YogaWorks and defendants Cowen, Stephens and
14  Guggenheim, on behalf of the Underwriter Defendants (defined herein), wrote
15  separately to the SEC to request that YogaWorks' Registration Statement be
16  accelerated and declared effective as of July 19, 2017.  Unsuccessful in that request
17  the IPO commenced the next month, half-way into the Company's third quarter.  The
18  IPO pitch was that YogaWorks had recently grown through a successful acquisition
19  strategy.  The Company was supposedly successful because it had strong "studio-level
20  economics" combined with studio acquisitions that return invested capital in two to
21  four years, and an infrastructure that could be leveraged so that as the studio base was
22  growing, expenses for corporate and regional overhead were becoming a smaller
23  percentage of net revenues and profitability.  The IPO was priced at $5.50 per share.
24  7.3 million shares sold.

25      5.       The Registration Statement and Prospectus (defined herein) contained
26  material misstatements and misleading statements that suffered from the omission of
27  significant information.  The Company's business model was not working.  And
28  omitted  facts  concerning  then-current  losses  and  sequential  and  year-over-year

Cases\4850-3151-9383.v1-5/21/19

quarterly financial and operational metrics related to (1) studio-level profitability; (2) the reasons for declining revenue; and (3) corporate infrastructure costs and economies of scale - tended to demonstrate that.

6.       Investors initially accepted the Company's excuse for providing only limited current financial information, namely "[o]ur financial statements for the quarter ended June 30, 2017 are not yet available . . . ."  But that was a misstatement. The Company's financial statements for the second quarter were in fact available and the Company was aware of them.  Investors also initially accepted the proposition that revenues were temporarily flat because of a shift in sales mix that would be beneficial long term.  That was a misstatement too.  The sales mix shift was to "grab" cash and declining customer experience and class quality was negatively impacting revenues. The omitted information was important.  Among other things showing that is investor response as information was revealed beginning shortly after the IPO.





7.     In YogaWorks' maiden quarter, half-way complete as of the IPO, the adverse trend continued.  As the risks omitted further materialized, the Company began spiraling towards a liquidity crisis.  Within months investors lost 50% of their investment and YogaWorks was described as possibly the worst IPO of the year.  The Company's liquidity was questioned.  A year after the IPO, as YogaWorks became a "penny stock," even analysts employed by the Underwriter Defendants downgraded the Company and took back their astronomical price targets.  As one independent analyst wrote:

> [T]here's only $15.5 million of cash remaining to support YogaWorks' spending spree. If YogaWorks' current cash burn run rate holds, it has barely over a year left of operations before it has to raise additional capital. With shares trading near pink-sheet territory, raising equity capital seems to be out of the question. On the credit side, only the riskiest of venture-debt lenders would want to lend to an unprofitable company like this - and even if YogaWorks were able to pull that off, it would come at a crippling interest rate. . . .  In my view, this company is headed into the ground.

That was nine months ago.  Shortly afterwards, the National Association of Securities Dealers Automated Quotations ("NASDAQ") threatened delisting.

8.     As of this filing, YogaWorks had just filed its Report on Form 10-Q for the quarter ended March 31, 2019, which revealed the Company has $6 million of cash remaining and has a burn rate of $4.6 million a quarter, as confirmed by the CEO on the "earnings" conference call.  The Report on Form 10-Q states:  "we had negative working capital of $4.0 and $0.6 million at March 31, 2019 and December 31, 2018, respectively . . . the Company needs additional financing to fund its operations. These conditions raise substantial doubt about our ability to continue as a going concern."

- 4 -

**JURISDICTION AND VENUE**

9.     The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the 1933 Act (15 U.S.C. §§77k, 77l, and 77o).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act (15 U.S.C. §77v).

11.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) as the alleged misleading public filings and press releases entered this district and the Company's headquarters are located in this district.

12.    Defendants' wrongful acts also arose in, were directed in and emanated from, in part, this District, including (but not limited to) the direction of processes leading to execution of the IPO, dissemination of materially misleading statements into this District, the purchase of the Company's common stock by members of the Class (defined herein) who reside in this District and the sale of the Company's common stock in this District by certain of the Underwriter Defendants (defined herein).

13.    In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

14.    Lead Plaintiff Inter-Local Pension Fund GCC/IBT, as described in the certification previously submitted to the Court, and incorporated herein, purchased YogaWorks common stock pursuant to the Registration Statement and Prospectus ("Registration Statement") in the Company's IPO and was damaged thereby.  Lead Plaintiff purchased those shares from defendant Stephens Inc., in response to being invited to indicate interest in the IPO by representatives of Stephens Inc., at the behest of YogaWorks.

15.     YogaWorks is a Delaware corporation with principal executive offices located at 5780 Uplander Way, Culver City, California 90230. YogaWorks common stock trade on NASDAQ under the ticker symbol "YOGA." YogaWorks is subject to liability as an issuer, seller and control person, and all the statements and solicitation herein made by YogaWorks' officers were on behalf of YogaWorks. YogaWorks designated numerous personnel in the working group for the IPO, including its CEO and CFO, both of whom not only reviewed and approved the offering documents, but also participated in the preparation of road show presentations according to a power point and talking points/script that was reviewed and approved by them. YogaWorks' representatives at the road show pitched investors in the IPO in related meetings, calls and webcasts.

16.     Defendant Rosanna McCollough ("McCollough") is the Company's President, Chief Executive Officer ("CEO"), and member of the Board of Directors (the "Board") and held these positions at the time of the IPO. As the top YogaWorks executive in the IPO working group, McCollough reviewed and approved, and participated in making statements in the Registration Statement. She also reviewed, edited and approved the IPO's road show power point presentation and road show talking points and script, and she participated in making the false and misleading statements alleged herein at the road show as YogaWorks' CEO. McCollough was motivated by the financial implications of an IPO for YogaWorks and its controlling shareholder Great Hill Partners, as well as for herself. By the IPO, Great Hill Partners obtained liquidity for its investment in the Company and was repaid approximately $3.3 million in connection with Great Hill Partners convertible notes under which the Company was indebted. McCollough owned over 250,000 shares of common stock in the Company, including shares directly held as well as shares issuable upon the exercise of options exercisable as of the IPO or less than 60 days after the IPO. She also was granted over 196,000 shares of common stock in connection with the IPO at

- 6 -

1   a price of $0.00 per share pursuant to restricted stock units, over 50% of which were

2   vested as of the IPO.

3       17.   Defendant Vance Chang ("Chang") is YogaWorks' Chief Financial

4   Officer ("CFO") and held this position at the time of the IPO. As the number two

5   YogaWorks executive in the IPO working group, Chang reviewed and approved, and

6   participated in making statements in the Registration Statement.  He also reviewed,

7   edited and approved the IPO's road show power point presentation and road show

8   talking points and script, and he participated in making the false and misleading

9   statements alleged herein at the road show as YogaWorks' CFO.  Chang was

10  motivated by the financial implications of an IPO for YogaWorks and its controlling

11  shareholder Great Hill Partners, as well as for himself.  Chang owned over 205,000

12  shares of common stock in the Company, including shares directly held as well as

13  over 72,000 shares issuable upon the exercise of options exercisable as of the IPO or

14  less than 60 days after the IPO.  He also was granted over 108,000 shares of common

15  stock in connection with the IPO at a price of $0.00 per share pursuant to restricted

16  stock units, over 25% of which were vested as of the IPO.

17      18.   Defendant Peter L. Garran ("Garran") serves at the Chairman of the

18  Board of YogaWorks, he held this position at the time of the IPO and was also

19  appointed to the Company's Audit Committee following the IPO. Defendant Garran

20  was caused to be elected to the Board by Great Hill Partners to serve at the favor of

21  the Great Hill Partners entities, identified in ¶24 below, and he did and does so as a

22  Partner at Great Hill Partners, L.P.  Acting in part on behalf of those entities, Garran

23  also approved McCollough's compensation as well as Chang's compensation

24  (including the compensation of each executive officer of the Company), and

25  performed the critical processes leading to execution of the IPO.

26      19.   Defendant Michael A. Kumin ("Kumin") serves as a Director of the

27  Board and was a Director at the time of YogaWorks' IPO.  Defendant Kumin was

28  caused to be elected to the Board by Great Hill Partners to serve at the favor of the

Great Hill Partners entities, identified in ¶24 below, and he did and does so as Managing Partner at Great Hill Partners, L.P., manager of GHP V, LLC, and manager of Great Hill Investors, LLC. GHP V, LLC is the sole general partner of the sole general partner of Great Hill Equity Partners V, L.P., which held 99.9% of the Company's stock as of the IPO, and which Kumin beneficially owned. Acting in part on behalf of those Great Hill and GHP entities, Kumin also approved McCollough's compensation as well as Chang's compensation (including the compensation of each executive officer of the Company) and performed the critical processes leading to execution of the IPO.

20. Defendant Michael J. Gerend ("Gerend") serves as a Director of the Board, was a Director at the time of YogaWorks' IPO and was appointed Chairman of the Compensation Committee and a member of the Audit Committee following the IPO. Defendant Gerend was caused to be elected to the Board by Great Hill Partners.

21. Defendant Brian T. Cooper ("Cooper") serves as a Director of the Board, was a Director at the time of YogaWorks' IPO and was appointed Chairman of the Audit Committee and a member of the Compensation Committee following the IPO. Defendant Gerend was caused to be elected to the Board by Great Hill Partners.

22. The defendants identified in ¶¶16-21 above signed the false and misleading Registration Statement used to conduct the IPO and are referred to herein as the "Individual Defendants." The defendants referenced above in ¶¶16-17 are key members of the IPO working group and executives of YogaWorks who pitched investors in the road show to sell the IPO at the behest of the Company and the Underwriter Defendants, and are sometimes referred to herein as the "Executive Defendants." Defendant Yogaworks and the Individual Defendants are strictly liable for the false and misleading statements in the Registration Statement.

**UNDERWRITER DEFENDANTS**

23. Defendants Cowen and Company, LLC ("Cowen"), Roth Capital Partners, LLC ("Roth"), Stephens Inc. ("Stephens"), Guggenheim Securities, LLC

- 8 -

1    ("Guggenheim"), and Imperial Capital, LLC ("Imperial") (collectively referred to as

2    the "Underwriter Defendants") served as underwriters for the IPO, sold 7.3 million

3    shares of YogaWorks common stock in the IPO and collectively received over $2.8

4    million in fees and commissions for soliciting and selling the shares in the IPO.

5    Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and

6    misleading statements in the Registration Statement as follows:

7             (a)     The Underwriter Defendants are investment banking houses which

8    specialize, inter alia, in underwriting IPOs of securities.   They served as the

9    underwriters of the IPO and shared more than $2.8 million in fees collectively.   The

10   Underwriter Defendants determined that in return for their share of the IPO proceeds,

11   they were willing to merchandize YogaWorks stock in the IPO, and as stated in the

12   Registration Statement they "propose[d] to offer the shares of common stock to the

13   public as the public offering price set forth on the cover of [the] prospectus," $5.50

14   per share.   In the bakeoff that determined the composition of the underwriting

15   syndicate, the Underwriter Defendants extolled their ability to market YogaWorks

16   common stock.  Each of the Underwriter Defendants designated personnel to the IPO

17   working group, including investment bankers, analysts, associates and counsel, to

18   market the Company's stock, and those personnel worked on and approved the

19   content of YogaWorks' Registration Statement and road show presentation.   The

20   Underwriter Defendants arranged a multi-city road show prior to the IPO during

21   which they, and the Executive Defendants, met with potential investors and presented

22   highly favorable information about the Company, its operations and its financial

23   prospects.   The Underwriter Defendants also promoted YogaWorks' IPO to their

24   bank's own clients and sold shares to those clients and brokerage account holders.

25            (b)     The Underwriter Defendants also demanded and obtained an

26   agreement from the Company that YogaWorks would indemnify and hold the

27   Underwriter Defendants harmless from any liability under the federal securities laws.

28

1  They also made certain that YogaWorks had purchased millions of dollars in
2  directors' and officers' liability insurance.

3          (c)     Representatives of the Underwriter Defendants also assisted
4  YogaWorks and the Individual Defendants in planning the IPO, and purportedly
5  conducted an adequate and reasonable investigation into the business and operations
6  of YogaWorks, an undertaking known as a "due diligence" investigation.  The due
7  diligence investigation was required of the Underwriter Defendants in order to engage
8  in the IPO.  During the course of their "due diligence," the Underwriter Defendants
9  had continual access to confidential corporate information concerning YogaWorks'
10  operations and financial prospects.

11         (d)     In addition to availing themselves of virtually unbridled access to
12  internal corporate documents, agents of the Underwriter Defendants met with
13  YogaWorks' management, top executives and outside counsel and engaged in
14  "drafting sessions" in advance of the IPO.  During these sessions, understandings were
15  reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO,
16  including the price range at which YogaWorks stock would be sold; (iii) the language
17  to be used in the Registration Statement; (iv) what disclosures about YogaWorks
18  would be made in the Registration Statement; and (v) what responses would be made
19  to the SEC in connection with its review of the Registration Statement.  As a result of
20  those constant contacts and communications between the Underwriter Defendants'
21  representatives and YogaWorks' management and top executives, the Underwriter
22  Defendants knew, or should have known, of YogaWorks' existing problems as
23  detailed herein.

24         (e)     The Underwriter Defendants caused the Registration Statement to
25  be filed with the SEC and declared effective in connection with the offers and sales of
26  securities registered thereby, including those to Lead Plaintiff and the other members
27  of the Class.

28

- 10 -

## CONTROL DEFENDANTS GREAT HILL PARTNERS

24.     Defendant Great Hill Partners, L.P., through its subsidiaries and/or affiliated companies, including defendant GHP V, LLC, defendant Great Hill Equity Partners V, L.P. (collectively, "Great Hill Partners") and Great Hill Investors, LLC, acquired YogaWorks in July 2014.  Great Hill Partners (and each of the entities defined therein) controlled YogaWorks and certain of the Company's directors.  GHP V, LLC is the sole general partner of the sole general partner of Great Hill Equity Partners V, L.P., which held 99.9% of the Company's stock as of the IPO and 71.5% of the outstanding shares of YogaWorks as of August 28, 2018.

25.     Once Great Hill Partners acquired the Company, it wielded significant influence over the management and operations of the Company.  Great Hill Partners replaced the CEO, CFO, and Chief Operating Officer ("COO"), eliminated and replaced a number of management positions, and instituted an aggressive cost-cutting program that eliminated or backfilled management, staff and teaching positions across the organization.  The IPO was understood at the outset to provide Great Hill Partners its investment exit by providing liquidity and payment to Great Hill Partners.  The officers and directors that Great Hill Partners put on the board understood that.  Great Hill Partners was recognized within the Company as being responsible for replacing monthly dues with class packages and changing the structure of studio management. In addition to this, Great Hill Partners caused the Company to enter an agreement whereby Great Hill Partners would provide general management, consulting and advisory services to the Company.  The agreement included payment for those services, including but not limited to Great Hill Partners services related to attending and participating at board meetings, advising on studio acquisitions, developing and supervising the Company's capital structure and strategies for increasing financial performance.  Indeed, Great Hill Partners was recognized within the Company as being responsible in part for decreasing studio quality, class attendance and quality, as well as studio profitability.

26.     As stated in the Registration Statement, Great Hill Partners "will be able to exercise a controlling influence over matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, and have significant influence over [YogaWorks'] management and policies for the foreseeable future."   The influence over the management and operations of the Company by Great Hill Partners was (and continues to be) so great that the Company's directors and top officers that Great Hill Partners controls and influences, under the Company's certificate of incorporation, may pursue opportunities directly in conflict with the Company.  As stated in the Registration Statement:

> Our certificate of incorporation will provide for the allocation of corporate opportunities between us and Great Hill Partners.  Under these provisions, neither Great Hill Partners, its portfolio companies, funds or other affiliates, nor any of their officers, directors, agents, stockholders, members or partners will have any duty to refrain from engaging, directly or indirectly, in the same business activities, similar business activities or lines of business in which we operate. . . . [S]uch . . . opportunities may not be available to us.

27.     Great Hill Partners has executive offices in Boston, Massachusetts.  Great Hill Partners, through Kumin and Garran, as well as McCollough and Chang (over whom Great Hill Partners wielded considerable influence), and Great Hill Partners employees, directed and participated in the steps critical to effecting the IPO by traveling to California to participate in board, board committee and management activities, or by directing substantial communications into California for the purpose of controlling the Company and executing the IPO.  These activities included, but were not limited to, review, approval, signing or authorization of the signing of the Registration Statement, voting (including voting their shares) to execute the IPO, and by having otherwise directed through the Great Hill Partners' authority processes leading to execution of the IPO, including retaining the Underwriter Defendants,

- 12 -

1  registration, qualification, authorization, pricing, offering to the public and issuance
2  and sale of the shares in the IPO.

3      28.   YogaWorks, the Individual Defendants, the Underwriter Defendants and
4  Great Hill Partners are collectively referred to herein as, "defendants."

5  **SUBSTANTIVE ALLEGATIONS**

6  *Background*

7      29.   Founded in 1987, YogaWorks was a single yoga studio in Santa Monica,
8  California.  Between 1996 and 2014, YogaWorks grew to 29 studios.  In July 2014,
9  Great Hill Partners acquired YogaWorks for $45.6 million in cash and added through
10  its management and control, approximately 23 studios. Great Hill Partners currently
11  owns approximately 70% of YogaWorks' outstanding common stock.

12      30.   YogaWorks claims that it is "one of the largest and fastest growing
13  providers of high quality yoga instruction in the U.S." and "the only national, multi-
14  discipline yoga instruction company."

15      31.   YogaWorks generates most of its revenue from offering a variety of yoga
16  classes at its studios.  The in-studio classes offer yoga instruction for all skill levels in
17  various yoga styles.  The prices for classes vary by location and region, but on average
18  students pay $90-$145 per month for an unlimited membership.  YogaWorks offers
19  six-month and annual prepaid memberships, as well as class packages in increments
20  of 10 to 20 classes.

21      32.   YogaWorks also derives revenue from teacher training programs and
22  online subscriptions of MyYogaWorks.com.  The teacher training program began in
23  1990 and has graduated approximately 11,000 students.  These graduates are
24  considered "ambassadors of the YogaWorks brand."  YogaWorks offers a 200-hour
25  and a 300-hour training program, taught in 16 countries at YogaWorks studios as well
26  as non-YogaWorks studios.  Tuition for the 200-hour program is approximately
27  $3,500 and for the 300-hour program is approximately $4,200. MyYogaWorks.com
28  provides online subscriptions for access to YogaWorks' on-demand video library of

- 13 -

over 1,100 classes.  In 2017, MyYogaWorks.com streamed approximately 700,000 classes to over 25,000 users.  YogaWorks charges $15 per month for the subscription which is reduced to $5 per month for those with YogaWorks studio memberships.

33.    Profitable studio acquisitions are vital to YogaWorks' growth and financial viability, as since its inception, this was YogaWorks' focus.

34.    At the time of the IPO, YogaWorks owned 50 studios in California, New York City, Boston and the Baltimore/Washington, D.C. area.

35.    YogaWorks' growth is driven mainly through acquisition of yoga studios in highly fragmented markets.  The Registration Statement stated, "[t]hrough acquisitions, we believe we can quickly gain students, grow our market share and build on the operating momentum of these acquired businesses."

36.    YogaWorks' acquisition strategy is driven by its purported belief that acquisitions of existing studios that already have a student base is an "effective, profitable and risk-mitigating way to enter a new regional market" rather than building new studios and waiting for attendance to ramp up.

37.    On June 23, 2017, YogaWorks filed a registration statement on Form S-1 for a proposed initial public offering.  The June 23, 2017 registration statement was followed by several amendments, the last of which was filed on August 10, 2017 which became effective that day.  On August 11, 2017, YogaWorks filed a Prospectus pursuant to 17 C.F.R. 230.424(b)(4), which is incorporated into the Registration Statement (the "Prospectus"), with the SEC.  On August 16, 2017, YogaWorks completed its IPO in which it offered 7.3 million shares at $5.50 per share.

38.    The Registration Statement stated the intended use of the IPO proceeds was for capitalization and financial flexibility, repayment of a $3.3 million note to Great Hill Partners, and a $7 million loan to Deerpath Funding LP, funding an acquisition and for working capital and other general corporate purposes. The IPO reaped net proceeds of $35 million.

39.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading.  Furthermore, it was not prepared in accordance with the rules and regulations governing its preparation.

## DEFENDANTS' DISCLOSURE OBLIGATIONS

40.     In their capacities as signers of the Offering Materials and/or an issuer, statutory seller, offeror, control persons and/or underwriter of the shares sold pursuant to the Registration Statement, each of the defendants are strictly liable for the misstatements and omissions alleged herein pursuant to §§11, 12(a)(2) and 15 of the 1933 Act.

41.     Due to the materially deficient Offering Materials, defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties.  Item 303 of SEC Registration S-K, 17 C.F.R. §229.303(a)(3)(ii), requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

42.     Defendants further violated their independent, affirmative duty to adequately "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky."  In contravention to Item 503 of SEC Registration S-K, 17 C.F.R. §229.503(c), defendants failed to disclose several risks that have already materialized at the time of the IPO that were unknown to Plaintiff and other YogaWorks investors.

## MATERIAL MISSTATEMENTS, MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

*Context*

43.     The first section of the Prospectus, pages 1-12 (the "Prospectus Summary"), attached hereto as Ex. 1, presented YogaWorks as a successful, growing business with unique strengths.  Statements included: "We are one of the largest and

- 15 -

fastest growing providers of high quality yoga instruction in the U.S., with almost 3 million student visits in 2016 and 50 company-owned studios as well as our Internet-based digital media service, MyYogaWorks.com." It highlighted: "**Strong Financial Performance**."

> Our significant growth is reflected in:
>
> - 49 studios at December 31, 2016 reflecting a compound annual growth rate, or CAGR of 19.5%, from 24 studios at December 31, 2012 (primarily related to our acquisition of 17 studios in 2015);
> - 2.9 million visits in 2016, reflecting a CAGR of 13.6%, from 1.8 million visits in 2012; and
> - Net revenues of $55.1 million in 2016, reflecting a CAGR of 10.9%, from $36.4 million in 2012.

44.    The Prospectus Summary positively described "**Our Market Opportunity**," with such statements as:

> Yoga awareness among Americans has increased from 75% in 2012 to 90% in 2016, according to the 2016 Yoga in America Study. According to the same study, in 2016, yoga practitioners spent over $16 billion on instruction, apparel, equipment and yoga accessories; over one-third of that figure, or approximately $5.8 billion, was spent on instruction in 2016. At $16 billion in 2016, spend on yoga has increased by $6 billion since 2012.

In the "**Student Profile**," it stated: "Yoga is practiced by a number of desirable consumer demographics and YogaWorks is well positioned to reach a broad population due to our inclusive, multi-discipline and broad program offerings."

45.    The Prospectus Summary also included "**What Sets Yogaworks Apart**," highlighting a "*High Quality Yoga Experience*," the "*Gold Standard of Yoga Teacher Training*," and "*Strong Studio-Level Economics*."   YogaWorks was

- 16 -

described as the "***Acquirer of Choice with a History of Successful Acquisitions***," and a "***Proven and Experienced Senior Management Team***."

46.    The Prospectus Summary promoted YogaWorks' "**Growth Strategy**," with such statements as: "We believe we are ideally positioned to consolidate the highly fragmented yoga studio market."  It also stated:

> Over the past 14 years, we have successfully integrated numerous acquisitions. . . . Through future acquisitions, we can leverage our corporate infrastructure to grow our brand in both new and existing markets by quickly tapping into the thriving yoga communities that already exist in nearly every city in the U.S.

As part of YogaWorks' growth strategy, the Prospectus Summary highlighted the Company was "***Driv[ing] Increased Visits, Net Revenues and Regional Market Share***," and that the Company benefitted from being able to "***Leverage our Infrastructure***," and "***Pursue Brand Extension Opportunities***."

47.    The Prospectus Summary included multiple graphics, most of which depicted arrows with upward trajectories describing the Company's financial and operational performance.  *See* Ex.1 at 3-4.

48.    Elsewhere in the Registration Statement, the information in the Prospectus Summary was repeated in a description of the Company's "**Business**," with similar and additional graphics and highlighted presentations.  *See* Ex.2 at 75-87. Within the context above and throughout, the Registration Statement suffered from material misstatements, misleading statements and omitted material facts.

***Material Misstatements, Misleading Statements and Omitted Material Facts***

49.    In the Prospectus Summary, the Registration Statement highlighted "**Recent Developments**" that included "***Preliminary Second Quarter Results***."  It stated: "Our financial statements for the quarter ended June 30, 2017 are not yet available . . . ." That was a misstatement.  The Company's financial statements for the second quarter were in fact available and the Company was aware of them.

- 17 -

50.     Thereafter, the Prospectus Summary presented "the following estimated results for the quarter ended June 20, 2017:  Net revenues of between $12.3 million and $12.6 million; and Visits of between 700,000 and 720,000."  It also purported to explain that:

> The decrease in net revenues from $13.3 million for the quarter ended June 30, 2016 was primarily due to a larger portion of our sales for the quarter ended June 30, 2017 being recognized as deferred revenue. . . . This sales mix shift resulted in less revenue being recognized during the second quarter of 2017 than the same quarter in 2016, in which we had a higher percentage of monthly membership revenue.

It also stated: "Our decision to offer class packages at all of our studios also impacted our number of visits, as students on class packages tend to visit studios less than students with memberships, which primarily led to the decrease from 754,567 visits for the quarter ended June 30, 2016."  The discussion also included numerous "[f]actors" that could cause the "estimates to differ."

51.     Those statements in ¶50 above were materially misleading because they omitted material facts from the Company's financial statements demonstrating multiple significant year-over-year negative trends that also reflected adversely on the Company's studio-level profitability, ability to successfully acquire and integrate studios and to reduce costs by leveraging corporate overhead and scale, and the Company's long-term acquisition plan.  As of the IPO:

(a)     the Company's financial statements reflecting deferred revenues for second quarter ended June 30, 2017 demonstrated combined net revenue and deferred revenues year-over-year had declined.  The statement that the "sales mix shift resulted in less revenue being recognized during the second quarter of 2017 than the same quarter in 2016," was materially false and misleading because the amount of deferred revenue was less than the difference between net revenue in those year-over-

- 18 -

1   year quarters.  Contrary to the impression that the sum of net revenues and deferred

2   revenues increased year-over-year, that sum had ***decreased***, meaning that the shift in

3   sales towards class packages was not improving the Company's business.  As written

4   by one financial writer when the omitted information was revealed, the "with $12.5

5   million in revenue and $0.6 million in deferred revenue increase" – "[t]his is still

6   below the $13.3 million of revenue posted in 2Q16. . . . A $0.6 million increase in

7   deferred revenues barely masks this quarter's disappointing revenue performance."

8           (b)    the Company's financial statements reflected Studio-Level

9   earnings before tax, depreciation and amortization ("EBITDA") had ***declined more***

10  ***than 15%***  to approximately $2.2 million in the second quarter ended June 30, 2017

11  from $2.6 million for the second quarter ended June 30, 2016.  This meant that the

12  Company significantly missed its internal margin target of 20%, for the Studio-Level

13  EBITDA margin had declined to approximately 17.39% in the second quarter ended

14  June 30, 2017 from 19.36% for the second quarter ended June 30, 2016.  Not only did

15  the decreasing margin reflect a quarterly year-over-year trend, it reflected a significant

16  year-over-year decline of over 10% and a sequential recurring decline below the level

17  of profitability admittedly needed by the Company to obtain sufficient return on

18  capital to fund its operational strategy.

19          (c)    the Company's financial statements reflected overall net loss,

20  EBITDA and Adjusted EBITDA significant declines for the second quarter ended

21  June 30, 2017.  Net loss ***increased 150%*** to approximately $4.4 million from $2.8

22  million for the second quarter ended June 30, 2016.  Adjusted EBITDA increased

23  ***more than tenfold (10x)*** to approximately ($551,000) from ($46,000) for the second

24  quarter ended June 30, 2016.  As one financial writer put it upon learning of the

25  omitted information, "Adjusted EBITDA's massive decline from -$46,000 to -

26  $551,000 . . . shows that the company is still unable to capture true operating leverage

27  on its portfolio of 50 yoga studios.  The corporate segment is still eating up too much

28  of profits without providing any meaningful improvement to the studio portfolio."

- 19 -

52.     A theme in the Registration Statement was that revenues and class visits in certain periods were temporarily declining due to a shift in business and pricing strategy towards selling more class packages, which would increase business and even in the short term be offset by increased deferred revenue.   For example, the Registration Statement stated:

> *With the adoption of our more flexible pricing strategy in July 2016, our sales mix has shifted toward a higher number of class-package sales and a corresponding decline in monthly membership sales*.  We anticipate this trend to continue at a decreasing rate over time as students in our existing studios purchase class packages more frequently than memberships and as we acquire and open additional studios, and expect a more balanced mix between class packages and memberships over time.  *We expect that the impact of this shift in sales mix will be a reduction in the amount of revenue recognized in a given period by an increase in deferred revenue liability associated with class package sales, as well as a decrease in student visits, as students on class packages tend to visit studios less than students with membership*.

(Emphasis added.)

53.     And with respect to studio visits, the Registration Statement stated:

> *Our decision to offer class packages at all of our studios also impacted our number of visits*, as students on class packages tend to visit studios less than students with memberships, which primarily led to the decrease from 754,567 visits for the quarter ended June 30, 2016. *We anticipate this trend to continue at a decreasing rate over time as students in our existing studios purchase class packages more frequently than memberships and as we acquire and open additional studios, and expect a more balanced mix between class packages and memberships over time*.  While our strategy to sell more class packages

- 20 -

has had an impact on both our net revenues and visits during the transition period, we believe the implementation of this strategy allows us to better serve our students and will draw a broader student base as consumers favor more flexible pricing options.

(Emphasis added.)

54.     The above statements in ¶¶52-53 were materially false and misleading when made and omitted material facts.  It was internally understood at the Company that the shift to class packages was made in advance of the IPO to increase cash flow, as package prices were greater than monthly membership charges.  The relationship of deferred revenue to lost membership revenue was not as described and revenue had been decreasing as a result of other factors.  Cost-cutting measures instituted since Great Hill Partners acquired YogaWorks were negatively impacting class quality and customer experience, which related internal metrics as of the IPO explained decreasing visits and revenues.  Those measures included cutting pay and reducing management and employee headcount or backfilling positions with lower paid, lesser qualified employees across the organization.  Cleaning costs were cut and cleaning labor was reduced as well.

55.     Thus, total student visits per quarter for the last four consecutive quarters of 2016 leading up to the IPO, *i.e.*, since before (and not because of) the Company-wide sales mix shift to class packages.  Student visits also declined quarter over quarter leading up to the IPO, declining from 789,677 in the first quarter of 2016, to 760,707 in the second quarter of 2017, and from 754,595 in second quarter of 2016 to 705,979 in the second quarter of 2017.  Similarly, students per class decreased from 17.6 in first quarter of 2016 to 16.8 in first quarter of 2017 and from 16.3 in second quarter of 2016 to 15.6 in second quarter of 2017.  Half of these year-over-year statistics were omitted from the Registration Statement, as well as four of the quarterly statistics, which would have revealed consistent sequential declines for over a year. The students per class declined from 17.6, to 16.3, to 15.8, to 15.1, and from 16.3 to

- 21 -

1    15.6, respectively, for the first through fourth quarters of 2016, and from the second

2    quarter of 2016 to the second quarter of 2017.  The reduction in the number of student

3    visits resulted in fewer classes per studio and lower revenue per studio.

4         56.    The Registration Statement asserted:  "As a result of our quality class

5    offerings, talented teachers and solid brand reputation, we have achieved a strong

6    historical financial performance."  This was emphasized with statements including

7    "we have a proven history of retaining and improving the student and teacher focus of

8    each studio or chain of studios acquired."  Those statements were materially false and

9    misleading and omitted material facts, for the reasons stated above at ¶¶51, 54-55, and

10   the reasons that follow.  Cost cutting had reduced staff (including teachers) at studios

11   and reduced management across the organization.  Positions were backfilled with

12   lesser paid and lesser qualified staff, teachers and management.  The resulting class

13   disruption and diminished quality from cost cutting had been consistently and

14   significantly reducing visits per class Company-wide for over a year.  Not only did

15   that reflect adversely on the YogaWorks "brand," it was having a corresponding

16   negative effect on revenue and Studio-Level EBITDA. Thus, as of the IPO, organic

17   growth from the factors touted was not occurring and the Company was below the

18   level of profitability admittedly needed by the Company to obtain sufficient return on

19   capital to fund its operational strategy.

20        57.    The Registration Statement stated YogaWorks would benefit from

21   economies of scale and from centralized management and less overhead per capita.

22   Further, defendants stated that YogaWorks had a corporate infrastructure in place to

23   support its future acquisition growth such that as YogaWorks grew, its overhead costs

24   would become a smaller percentage of revenue of profitability, stating in relevant part:

25

26

27

28

*Leverage our Infrastructure*

In preparation for our continued growth, we have built out our corporate infrastructure over the past several years.  We now have the corporate, regional and studio-level management personnel in place, as well as the information technology platform, to support our future growth and acquisition strategy, without significant new investments in corporate infrastructure.

58.    Additionally, the Registration Statement asserted that strong studio-level economics would allow it to achieve economies of scale, thereby reducing overhead costs as a percentage of revenue, stating in relevant part:

As our studio base grows, expenses for our corporate and regional overhead should become a smaller percentage of our net revenues and profitability.

59.    The above statements in ¶¶57-58 were materially false and misleading when made and omitted material facts.  At the time of the IPO, YogaWorks' corporate overhead expenses were increasing as a percentage of sales and profitability.  For the second quarter ended June 30, 2017, YogaWorks incurred "[o]ther general and administrative expenses" of $2.7 million, or 21.7% of net revenue as compared to $2.6 million for the same quarter in 2016, or 19.8% of revenue.  In addition, because the Company had been backfilling regional and studio level management positions with lesser paid, lesser qualified personnel, it was causing disruption and necessitating training, which in turn was increasing costs.  Moreover, as of the IPO, the Company was also in the process of acquiring multiple smaller, less efficient studios that generated revenue substantially below the $500,000 to $700,000 level the Registration Statement identified.  As a result, the Company expected to continue to incur increased expenses without corresponding revenue, and this trend was continuing into the third quarter of 2017 (half of which was over at the time of the IPO) in which YogaWorks incurred "[o]ther general and administrative expenses" of $3.1 million, or

- 23 -

1  22.6% of net revenue as compared to $2.5 million for the same quarter of 2016, or

2  18.2% of revenue.

3       60.    The Registration Statement represented that YogaWorks had "strong

4  studio-level economics" as a result of targeting studios with average annual revenues

5  of at least $500,000 and a return of capital within two to four years of opening the new

6  studio, stating in relevant part:

7       ***Strong Studio-Level Economics***

8          We seek to generate attractive studio-level margins by increasing

9       the average number of students per class which in turn provides better

10       return on our fixed costs, such as teacher salaries and rent.  ***We target***

11       ***studios with average annual revenues between $500,000 to $700,000***

12       ***and a return on our invested capital to be within two to four years of***

13       ***opening a new studio***.  ***We approach our acquisition targets seeking***

14       ***similar returns.***  We believe that our strong studio-level economics are

15       important for us to grow our studio base and successfully execute our

16       acquisition strategy.

17  (Emphasis added.) [1]

18       61.    The Registration Statement also reported Studio-Level EBITDA for the

19  three months ended March 31, 2017 and March 31, 2016 of $3.2 million and $4.4

20  million, respectively, and Studio-Level EBITDA margins for the same period of

21  22.9% and 29.1%, respectively.  It also reported Studio-Level EBITDA for both the

22  year-ended December 31, 2016 and December 31, 2015 of $12.4 million and Studio-

23  Level EBITDA margins for the same periods of 22.5% and 25.6%, respectively.

24       62.    The above statements in ¶¶60-61 were materially false or misleading and

25  omitted material facts when made.  As of the IPO, YogaWorks had not been acquiring

---

[1]     In order to obtain a complete return on invested capital within two to four years, the studio-level EBITDA margins would have to be at least 20%, Conference Presentation, YogaWorks' at the 4th Annual Cowen's Future of the Consumer Conference, 18 (April 3, 2018), https://ir.yogaworks.com/static-files/1624037d-bee7-473a-9e28-08776ae8aade.

- 24 -

studios with the economics that it reported.  As a result of YogaWorks' deteriorating financial position before the IPO, it had begun acquiring smaller, less efficient studios that did not meet the criteria set forth in the Offering Materials of generating $500,000 to $700,000 in revenue per year. And it had smaller, less efficient studios in its pipeline.  For the third quarter 2017, YogaWorks acquired only three new studios for a total of $445,000.   Moreover, the Registration Statement omitted Studio-Level EBITDA results for the past two quarters that showed both year-over-year and sequential decreases *below* the Company's stated threshold for studio acquisition economics.  YogaWorks' Studio-Level EBITDA margin for the second quarter ended June 30, 2017 at the time of the IPO was only approximately 17.39%, well below the necessary 20% needed to recoup investment within two to four years. And for the second quarter ended June 30, 2017, Studio- Level EBITDA margin declined to 17.39% from 19.36% for the second quarter ended June 30, 2016, representing a significant year-over-year decline of over 10% and a sequential recurring decline below the level of profitability admittedly needed by the Company to obtain sufficient return on capital to fund its operational strategy.

63.     Indeed, this trend continued as YogaWorks continued to experience Studio-Level EBITDA margin declines below the necessary threshold of 19.2%, 18.6%, 18.1% and 14.8% for the third quarter of 2017, fourth quarter of 2017, first quarter of 2018 and second quarter of 2018, respectively.

64.     The Registration Statement stated that the Company's "leverageable infrastructure," "studio acquisition experience," and "tested integration procedures," among other things, enabled YogaWorks to "***preserve the acquired studio's unique appeal to its local community while successfully increasing visits and net revenues under our ownership***."  That statement was materially misleading because it omitted material facts concerning the Company's then-present acquisition economics and studio-level performance, as set forth in ¶¶51, 54-56, 59 above.  One significant reason why overall visits per class and overall Studio-Level profitability was

- 25 -

consistently declining was that class disruption and backfilled management and teacher positions were changing studio appeal, including customer experience and class quality.

65.    The Registration Statement contained pages and pages of numerous generalized possible "Risk Factors" that "*could*" possibly occur in the future and if they did actually occur, "*could* have a material adverse effect on [YogaWorks'] business."   Those statements were false or misleading and omitted material information because at times what was presented as possible "risks" that "could" happen were matters that had already materialized and were then-presently significantly adversely impacting the Company as of the IPO.

66.    The Registration Statement presented "net losses" only as a possibility, when, in fact, as of the IPO, YogaWorks was set to take in significant second quarter 2017 net losses and was on track to do the same in the third quarter 2017 (*see* ¶¶59, 81).  It stated:

> In 2015, we recorded an impairment of goodwill of $0.9 million. We did not record any impairment losses related to goodwill in 2016.  As of December 31, 2016, our goodwill balance was $17.7 million. Accounting rules require the evaluation of our goodwill at least annually, or more frequently when events or changes in circumstances indicate that the carrying value of such assets may not be recoverable.  Such indicators are based on market conditions and the operational performance of our business. In testing goodwill for impairment, if the implied fair value of the goodwill is less than the reporting unit's carrying amount, then goodwill is impaired and is written down to the implied fair value amount.  If a significant amount of our goodwill were deemed to be impaired, our business, financial condition and results of operations could be materially adversely affected.

1        We incurred a net loss of $2.6 million for the three months ended
2 March 31, 2017,  $1.5 million for the three months ended March 31,
3 2016,  $9.5 million in 2016 and $9.2 million in 2015 and had net cash
4 provided by operating activities of $0.8 million in 2016*. **If we continue
5 to experience net losses or our cash flows from operating activities
6 decline or become negative, it could require us to lower our assessment
7 of the fair value of our business.  If this were to occur**, we could be
8 required to record additional material impairment charges to goodwill or
9 other intangible assets which could have a material adverse effect on our
10 business, financial condition and results of operations.
11 (Emphasis added.)

12     67.    The statements above were false and misleading and omitted material
13 facts as set forth above and in ¶51.  In fact, YogaWorks' **net loss** for the quarter ended
14 June 30, 2017, which was complete before the IPO had **already increased** by more
15 than 50% over the same quarter of the prior year, and **net cash flows** from operating
16 activities had, as of the IPO, **already decreased** from cash **loss** for the six months
17 ended June 30, 2016 of a **negative** $450,069 to a **further cash loss** for the six months
18 ended June 30, 2017 of a **negative** $821,650.   Those trends, revealed in the
19 Company's second quarter 2017 results as of the IPO, showed deteriorating net losses.
20 Indeed, the risk concealed by that omitted information materialized with the recording
21 of a goodwill impairment of $7.5 million at the end of 2017, and an additional
22 goodwill impairment of $2.5 million assessed in the second quarter of 2018.

23     68.    The Registration Statement stated:
24     **Our growth strategy is highly dependent on our ability to successfully
25 identify and acquire studio targets and integrate their operations with
26 ours**.
27        Our growth strategy primarily contemplates expansion through
28 targeted acquisitions of other yoga studio businesses.  Implementing this

strategy depends on our ability to successfully identify opportunities that complement our businesses, share our business and company philosophy and operate in markets that are complementary to our operations and the communities in which we operate. We will also need to assess and mitigate the risk of any target opportunity, to acquire targets on favorable terms and to successfully integrate their operations with ours. ***We may not be able to successfully identify opportunities that meet these criteria, or, if we do, we may not be able to successfully negotiate, finance, acquire and integrate them. Even if we enter into confidentiality agreements or letters of intent with potential studios, we may not be able to complete the acquisition. If we are unable to identify and acquire suitable studios, our revenue growth rate and financial performance may fall short of our expectations. If we are successful in acquiring studio targets, we may not be able to successfully integrate the operations of these studios with ours, to execute the growth objectives of our combined operations or to realize the revenue opportunities or cost savings that may be assumed.*** In addition, any such opportunity may require us to raise additional capital, which may be dilutive to our existing shareholders, or require us to incur additional indebtedness. ***If our analysis of the suitability of a studio or group of studios for acquisition is incorrect, we may not be able to recover our capital investment in acquiring such studios***.

(Emphasis added.)

69.     It also stated:

Our recently acquired or newly opened studios ***may*** negatively impact our financial results in the short-term, and ***may*** not achieve sales and operating levels consistent with our existing studios on a timely basis, or at all.

- 28 -

70.     The statements above in ¶¶68-69 were materially false and misleading because, as shown in ¶¶59, 62 above, the Company had *already* been acquiring studios that *did not* meet the Company's "criteria" and were not "suitable studios" (¶68) concerned financial performance, and such acquired studios as well as studios in the pipeline were *already* not generating revenues sufficient "to recover [YogaWorks'] capital investment."  In addition, the Company was already suffering from an inability to achieve "cost savings" that it was assuming, as demonstrated in ¶¶51, 59, 62 above.

71.     The Registration Statement also stated:

*If we fail to attract new students and teachers and retain existing students and teachers, it could have an adverse impact on our growth strategy as we may not be able to increase the number of visits to our studios or students that go through our teacher training*.

The performance of our studios and success of our growth strategy is largely dependent on our ability to continuously attract new students and teachers and retain existing students and teachers.  We cannot be sure that we will be successful in these efforts, or that visits to our studio classes and teacher trainings or participation in MyYogaWorks.com will not materially decline.  There are numerous factors that could lead to a decline in visits at established studios or that could prevent us from increasing our student visits at newer or acquired studios, including harm to our reputation, a decline in our ability to deliver quality yoga classes and teacher trainings at a competitive cost, the opening or acquisition of new studios or hosting of additional teacher trainings that may have the potential to cannibalize store sales in existing areas, the heightened presence of direct and indirect competition in the areas in which the studios are located, the decline in the public's interest in fitness through yoga, a deterioration of general economic conditions and a change in

- 29 -

consumer spending preferences or buying trends.  As a result of these factors, we cannot be sure that our student visits will be adequate to maintain or permit the expansion of our operations.  ***A decline in student visits levels may have a material adverse effect on our business, financial condition, results of operations and growth rate***.

(Emphasis added.)

72.    Those statements above were materially false and misleading because, as of the IPO, student visits were ***already*** consistently declining in sequential and year-over-year quarters, for the reasons stated at ¶¶54-55 above.  One of the reasons for that was that the Company had been for years replacing teachers, staff and management with lesser paid, less qualified personnel as part of the Company's cost-cutting strategy.  Consequently, materially declining student visits were ***already*** having a material adverse effect on YogaWorks, as shown in ¶¶51, 54-56 above, for revenues had been declining in in part as a result of declining class quality and customer experience.

73.    The Registration Statement also stated:

We may expand into markets where we have little or no direct prior experience, and we could encounter unanticipated problems, cost overruns or delays in opening studios in new markets or in the market acceptance of our studios. We will need to continue to improve our operating, administrative, financial and accounting systems and controls. We will also need to recruit, train and retain new yoga instructors, teacher trainers, studio and regional managers and other team members and maintain close coordination among our executive, accounting, finance, human resources, legal, marketing, sales and operations functions.

74.    Those statements above were materially false and misleading because, as of the IPO, due to cost cutting, the Company was ***already*** incurring substantial

- 30 -

1  overhead and studio-level expenses as a result of it backfilling management, staff and

2  teacher positions, as alleged at ¶¶54-56.  The Company's problems were not just a

3  matter of future expansion, YogaWorks was already bleeding red ink as a result of its

4  past and ongoing cost-cutting measures that were not revealed and the risks of which

5  were materializing as of the IPO, as shown in the omitted net losses and Studio-Level

6  profitability metrics.

7       75.    Each of the material omitted facts alleged above explains why all the

8  alleged statements were material misstatements or materially misleading.  Moreover,

9  Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required defendants to

10 "[d]escribe any known trends or uncertainties that have had or that the registrant

11 reasonably expects will have a material favorable or unfavorable impact on the sales

12 or revenues or income from continuing operations."  Similarly, Item 503 of SEC

13 Regulation S-K, 17 C.F.R. §229.503(c), requires, in the "Risk Factor" section of

14 registration statements and prospectuses, "a discussion of the most significant factors

15 that make the offering speculative or risky" and that each risk factor "adequately

16 describes the risk."

17      76.    The failure of the Registration Statement to disclose that the Company

18 was experiencing year-over-year quarterly declines in Studio-Level profitability at a

19 level below the Company's threshold to return capital in order to fund the Company's

20 operational strategy, and that visits per class across the organization were consistently

21 sequentially declining on a quarterly basis violated 17 C.F.R. §229.303(a)(3)(ii),

22 because these undisclosed facts would (and did) have an unfavorable impact on the

23 Company's sales, revenues and income from continuing operations.  This failure also

24 violated 17 C.F.R. §229.503(c), because these specific risks were not adequately

25 disclosed, or disclosed at all, even though they were some of the most significant

26 factors that made an investment in shares of YogaWorks speculative or risky.

27

28

**ADDITIONAL FACTS DEMONSTRATING THE OMITTED FACTS WERE MATERIAL AND THEREFORE WOULD HAVE BEEN CONSIDERED SIGNIFICANT BY INVESTORS**

77.     In addition to the nature of the omitted information alleged herein, the reactions of ordinary investors, independent analysts and the market, to revelations of previously omitted information, demonstrates materiality.

78.     YogaWorks was promoted and propped up by a phalanx of securities analysts employed by the Underwriter Defendants. Analysts employed by every single Underwriter Defendant wrote positive analyst reports even as the Company reported negative financial results and the Company's stock price moved towards penny stock territory. This was recognized by the investing community as investors and independent analysts responded to previously omitted information. As one independent registered investment advisor providing analysis for Seeking Alpha, wrote: the analyst reports with "sky high valuations [were] from the very same firms who brought the IPO to market." Conference call attendance was also closely controlled and dominated by the analysts working for the Underwriter Defendants. This, too, did not go unnoticed by the investing community, as reported on Seeking Alpha: "There were two things notably missing from the call. The first was ANY talk of you know, actually being profitable. Both the company and the analysts were all too happy to discuss deferred revenue and future M&A activity; not one person bothered to stop and discuss growing losses." "Analysts covering the company have all mimed each other in publishing a price target of $7 for the stock – though it must be noted, research coverage from the mid-tier banks that underwrote the offering (Cowen, Stephens, and Guggenheim) are unlikely to be perfectly impartial."

79.     Just weeks after the IPO, on September 21, 2017, after the close of the market, YogaWorks announced its second quarter financial results for the period ending June 30, 2017. The press release contained multiple financial metrics available as of the IPO, but not reported in the Registration Statement's discussion of "***Preliminary Second Quarter Results***." YogaWorks reported a net loss of $4.4

million, nearly double that of the same period of the previous year, Adjusted EBITDA losses over ten times greater than the same period of the previous year and Studio-Level EBITDA of $2.2 million as compared to $2.6 million for the same period of the previous year.  Although YogaWorks blamed the decline in net revenue on the shift from monthly memberships to class packages, deferred revenue only increased $0.5 million, and in the Report on Form 10-Q filed on September 22, 2017, as well as information provided in connection with the Company's conference call on September 21, 2017, the Company revealed student visits, number of classes and students per class were down quarter over quarter.

80.    Gary Alexander, providing analysis for Seeking Alpha, wrote a report disseminated after the close of the market on September 22, 2017, entitled: "YogaWorks: Q2 Leaves A Lot To Be Desired."

> A drop in revenues is a drop in revenues – don't be distracted by management's shifting of attention to class packages. A $0.6 million increase in deferred revenues barely masks this quarter's disappointing revenue performance.  Profitability also took a hit . . . . Adjusted EBITDA's massive decline from -$46,000 to -$551,000 already excludes the effect of legal settlements, and shows that the company is still unable to capture true operating leverage on its portfolio of 50 yoga studios. The corporate segment is still eating up too much of profits without providing any meaningful improvement to the studio portfolio.

A registered investment advisor, writing for Seeking Alpha the same day, also criticized the "class packages" explanation by the Company, and reacted negatively to the Company's revenue guidance for 2017, among other things.  On the same day, though admitting Studio-Level EBITDA and earnings were worse than expected, analysts employed by Underwriter Defendants, continued with "Buy" recommendations and price targets vastly exceeding the Company's trading price.

72.     YogaWorks' stock price dropped from $4.00 per share on September 21, 2017 to $3.53 per share on September 22, 2017, a fall of over 11% on heavy trading volume, and continued to decline to $2.83 per share in trading shortly thereafter as investors reacted to the negative financial results, and declining studio visits, classes and students per class statistics.

81.     In its maiden quarter as a public company – a quarter that was half-way completed when YogaWorks closed its IPO, the Company reported more increased losses year-over-year.  After the market's close on November 14, 2017, the Company reported a net loss of $4.6 million for the third quarter ended September 30, 2017, nearly *twice* that compared to the Company's net loss from the same period in 2016.  Adjusted EBITDA significantly decreased to a *negative* $432,000 as compared with a *positive* $428,000 from the same period in 2016.  Studio-Level EBITDA *decreased* approximately 10% year-over-year and Adjusted net loss increased almost 40% year-over-year.   Student  visits  declined  year-over-year,  again.   Investors  again demonstrated that the Company's year-over-year quarterly declines in profitability and other metrics were important.

82.     Securities  analysts  employed  by  the  Underwriter  Defendants acknowledged earnings measures were less than expected, including EPS, and Studio-Level EBITDA and Studio-Level EBITDA margin, which both posted year-over-year declines.  But they maintained "Buy" ratings with price targets nearly *three times* the YogaWorks trading price.  Again, this did not go unnoticed by investors.  Registered Investment  Advisor  F. S. Maks,  wrote  an  analysis  for  Seeking  Alpha  that  was disseminated on the morning of November 16, 2017.

> One of the most important parts of the earnings process is the Q&A session of the conference call. It is here where you get analysts asking hard hitting questions, as opposed to the massaged message as presented during the prepared remarks or in the 8k. With YogaWorks however this is not the case. At least 4 out of the 5 analysts were

- 34 -

underwriters of the IPO and the questions were more effective as stroking management's ego as opposed to being beneficial to shareholders.

Notably missing were any tough questions dealing with the breakdown of revenue . . . or discussions of what it would take for YogaWorks to be profitable at the bottom line and to be able to start returning capital to shareholders.

83.   With respect to the reported results, independent analysts responded negatively.  Gary Alexander, providing analysis for Seeking Alpha, wrote a report disseminated on the afternoon of November 15, 2017, entitled: "YogaWorks: Profits Deteriorate, But Adding Studios Ahead of Plan."  "General and administrative spending has nearly doubled y/y . . . ."  "Expenses . . . are out of control. . . .  The big question is: Is this a company that can continue to scale and add studios without emptying the bank? . . . .  Based on recent moves in the stock price, investors don't seem to think so." "Studio-Level EBITDA . . . [i]s it just dragging down the individual studios with the overhead expense ($8.1 million year to date) and dragging red ink across the company's bottom line?"  "Until the company sheds some light on how its expanded collection of studios is contributing to profits and not just revenue, I'd stay on the sidelines."  At approximately 7:00 a.m. the next day, F. S. Maks wrote an analysis for Seeking Alpha entitled:  "YogaWorks:  Like Kid Sports Where You Don't Keep Score."  "$4.6 million lost in the quarter, nearly double from Q3 2016 . . . flat year over year revenue despite acquiring new studios."  "YogaWorks completely fell apart on the things that matter . . . ."  "What other company celebrates not growing revenues year over year?"  "The 'adjusted EBITDA' came in at a loss of $432,000, within their guidance of a $300,000 to a $800,000 loss.  The concerning part for all investors however is that this compares with a $428,000 profit a year ago."

84.   YogaWorks' stock price dropped from an open of $2.86 per share on November 15, 2017 to close at $2.61 per share on November 16, 2017 and traded as

- 35 -

1  low as $2.35 per share, a fall of between approximately 9% and 18%, on heavy
2  trading volume, as investors as investors reacted to the negative results.

3        85.    On April 2, 2018, YogaWorks announced its financial results for the
4  fourth quarter of 2017 and full year 2017 by filing a non-timely annual report with the
5  SEC on Form 10-K, along with a Form 12b-25 indicating that YogaWorks was unable
6  to timely file its annual report "due to a delay in finalizing a goodwill impairment
7  charge related to the book value of the Company, relative to the Company's currently
8  market capitalization".  For 2017, YogaWorks recorded net revenue of $54.5 million
9  (as compared to $55.1 million in 2016) and a net loss of $23.4 million – more than
10 double the $9.5 million loss recorded in 2016. YogaWorks' hand-picked non-GAAP
11 metric Studio-Level EBITDA also declined from $12.4 million to $10.7 million.
12 YogaWorks also late recorded a goodwill impairment charge of $7.5 million, which
13 represented over one-third of its' prior goodwill asset, "primarily due to projected
14 cash flows and the Company's decline in market capitalization since the launch of the
15 IPO."  Investors again demonstrated that the Company's year-over-year quarterly
16 declines in profitability and other metrics were important.

17       86.    Securities analysts employed by the Underwriter Defendants,
18 acknowledged earnings measures were less than expected or flat, including EPS,
19 Adjusted EBITDA and Studio-Level EBITDA and Studio-Level EBITDA margin,
20 nonetheless maintained positive ratings with price targets nearly **two to three times** the
21 YogaWorks trading price.    It was pointed out to investors that analysts
22 "predominantly the underwriters . . . asked softball questions" and omitted probing
23 discussion of major causes for concern in response to the Company's recent reporting.

24       87.    With respect to the reported results, independent analysts responded
25 negatively. F. S. Maks wrote an analysis for Seeking Alpha disseminated at 12:53
26 p.m. on April 3, 2018, entitled:  "YogaWorks: Worse Than Expected." He wrote:

27

28

1    During this time period the company reported a GAAP Net Loss
2    of $11.8 million which compared with a $2.7 million loss for the same
3    quarter last year.

4                          *       *       *

5    The big area of concern however is with the full year results.

6    For the full year ending 12/31/2017 the company reported net
7    revenues of $54.5 million. This is down from $55.1 million earned by
8    the company for the prior year.

9    The company's losses also got worse as the company reported a
10   full year GAAP net loss of $23.4 million, up from a $9.5 million loss a
11   year ago.

12                         *       *       *

13   Even on a Non-GAAP basis the company's results deteriorated.

14   On a Non-GAAP basis the company reported a $1.2 million
15   Adjusted EBITDA loss, which compares with a $1.7 million EBITDA
16   profit a year ago.

17   Quite concerning of course is the studio level EBITDA which
18   declined to $10.7 million down from $12.4 million a year ago. This is a
19   13.7% year over year decline.

20   Lastly, even excluding the "one time" goodwill adjustment
21   charges the company took this quarter, the company's adjusted net loss
22   increased to $11.7 million from $9.1 million a year ago. This is a 28.57%
23   worse than a year ago.

24   He then summarized multiple "***major causes for concern***":

25   **1. Growing Losses –** the losses grew in all manners, both at the
26   top and bottom line.

27

28

- 37 -

1   **2. Declining Revenues** – The company's revenues declined year
2   over year, DESPITE significantly growing their number of studios.
3   Revenues declined from $55 million to $54 million.

4   **3. Declining Per Studio Revenue** – Breaking it down further, we
5   can see that YogaWorks generated $14.5 million from 66 studios in Q4.
6   This works out to $219k per studio. This is down from the $13.2 million
7   generated by 49 studios, or $269k per studio a year prior.

8   **4. Declining Per Studio EBITDA** – $2.7 million was generated
9   by 66 studios, or $40.9k per studio in Q4 2017. This compares with $2.5
10  million earned by 49 studios, or $51k per studio in Q4 2016.

11  88.    YogaWorks' stock price fell from an open of $2.94 per share on April 2,
12  2018 to a close of $2.35 per share on April 3, 2018, a 20% decline on heavy trading
13  volume, nearly 60% below the IPO price.

14  89.    Gary Alexander, providing analysis for Seeking Alpha, on April 6, 2018,
15  wrote a report entitled "YogaWorks: More Trouble Looms Ahead." Referring to the
16  reaction of investors to the recent reports from the Company, he wrote:

17          YogaWorks disappointed investors with its Q4 earnings release.
18  The idea behind YogaWorks is that a highly centralized, efficient
19  company can run a large, national chain of yoga studios and generate
20  premium growth and profitability.

21                                  *       *       *

22          Considering the company added 16 studios in the quarter (and
23  versus last year's Q4, that's 17 net studio adds), it's shocking that these
24  additions contributed to producing just 10% y/y revenue growth.

25          Even more puzzling - YogaWorks' guidance for FY18 calls for
26  $57-59 million of revenues. . . . The guidance almost implies that per-
27  studio revenues will take a nosedive.

28

- 38 -

1  Under a section called "**Growing losses call liquidity into question**," Alexander

2  wrote:

3              For the full FY17, YogaWorks' adjusted EBITDA sank to a loss

4       of -$1.2 million - and that's down from a profit of $1.7 million in FY16.

5       Net losses widened to -$23.4 million (a -43% net margin), more than

6       twice the loss of -$9.5 million in FY16. Adjusted EBITDA is also

7       forecast to get worse in FY18, with a range of -$3 million to -$4 million.

8       What this is essentially telling investors is that, no, YogaWorks can't

9       quite expand efficiently nor run its studios more profitably.

10                                    *       *       *

11      With a terrible track record for executing against its own targets as well

12      as lackluster guidance for the coming year, YogaWorks remains a stock

13      to avoid.

14      90.     On August 14, 2018, YogaWorks announced its financial results for the

15 second quarter of 2018. YogaWorks reported significantly increased net losses – *50%*

16 *more losses* – over the same period the prior year (*negative* $6.7 million from

17 *negative* $4.4 million), nearly *three times* the loss in Adjusted EBITDA from the

18 same period prior (*negative* $1.4 million from *negative* $551 thousand), and flat

19 Studio-Level EBITDA compared to the same period the prior year.  Making matters

20 worse, YogaWorks again recorded a goodwill impairment during the second quarter

21 of 2018, recording an additional $2.5 million impairment for the quarter.  Having cut

22 salaries and replaced management, which in part drove declining customer experience

23 and class quality as reflected in continued declining sequential and year-over-year

24 visit statistics, the Company reported it would need to increase corporate expenses

25 with training and brand building initiative.  Investors again demonstrated that the

26 Company's year-over-year quarterly declines in profitability and other metrics were

27 important.

28

- 39 -

1   91.   YogaWorks' stock price fell from $1.86 to close at $1.09 per share, an

2   additional 41%, on August 15, 2018.

3   92.   With YogaWorks approaching penny stock territory, a fraction of their

4   price targets, securities analysts employed by the Underwriter Defendants began to

5   downgrade their ratings and label their price targets "NA".   On August 15, 2018,

6   before the open of the market, Guggenheim wrote "We Move to NEUTRAL on Base

7   Business Challenges."  "2Q operating results were a mixed bag . . . revenue upside did

8   not flow through to the bottom line."  The next day Stephens wrote "[g]ross margin

9   was meaningfully lower than expected . . . company modestly raised its FY18 revenue

10  guidance, but meaningfully lowered its adj. EBITDA guidance."  On that same day

11  Roth reduced its target price, noting "studio-level EBITDA of $2.2M (14.8% margin)

12  missed estimates."  And Cowen downgraded with a headline of "Recommend Moving

13  to Sidelines," stating "margins are also expected to contract – reflected in the lowered

14  FY18 EBITDA guidance."

15  93.   Gary Alexander, providing analysis for Seeking Alpha, on August 19,

16  2018, wrote a report entitled:  "YogaWorks: Pushing Into Penny Stock Territory."

17       The company's adjusted EBITDA sank this quarter despite the

18       higher studio count, raising the question of whether YogaWorks'

19       business model is even viable.

20       Drilling down into the studio metrics raised some additional red

21       flags. The company's CEO noted that YogaWorks tried to implement

22       new classes to encourage more frequent attendance, but overall margins

23       were low. In addition, same-store visits (similar to same store sales

24       metrics at retail companies, which measures only the locations that have

25       been open for more than one year) declined -2% y/y.

26       Partly as a result of poor visitation metrics, YogaWorks' revenue

27       per studio (and profitability) has sagged. You'll note that despite having

28

- 40 -

a much larger studio count versus 2Q17, YogaWorks' per-studio revenues have declined.

\*     \*     \*

Studio-level EBITDA margins sank to 14.9%, 200 bps worse than 16.9% in the year-ago quarter. YogaWorks' CFO blamed the declining studio EBITDA margin on 'challenging same-store visits, higher rent and payroll costs for new and base studios,' as well as new classes which result in lower classes until they are built out. Absolute adjusted EBITDA, on the other hand, magnified losses to -$1.4 million, or a -9.2% margin that is 490 bps worse than -4.3% in 2Q17.

94.     Raising the specter of liquidity, he concluded:

. . . [T]here's only $15.5 million of cash remaining to support YogaWorks' spending spree. If YogaWorks' current cash burn run rate holds, it has barely over a year left of operations before it has to raise additional capital. With shares trading near pink-sheet territory, raising equity capital seems to be out of the question. On the credit side, only the riskiest of venture-debt lenders would want to lend to an unprofitable company like this - and even if YogaWorks were able to pull that off, it would come at a crippling interest rate. . . .  In my view, this company is headed into the ground.

95.     On December 12, 2018, YogaWorks filed an 8-K with the SEC, announcing that on December 6, 2018 it received a letter from NASDAQ stating that the market value of the publicly held shares of YogaWorks for the prior thirty business days fell below the exchange's $5 million minimum value and thus, YogaWorks was subject to delisting if it was unable to regain compliance. YogaWorks then received another similar letter from NASDAQ on December 12, 2018 for its noncompliance with NASDAQ's $1.00 minimum share price requirement.

- 41 -

96.    At the time of the filing of this action, YogaWorks' stock traded at $0.44 or 92% below the IPO price.  As shown below, YogaWork's trading price plummeted below comparable market and industry indices in response to the revelation of previously omitted negative company-specific information, showing investors considered the information important.



**LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS**

97.    Lead Plaintiff brings this action as a class action on behalf of all those who purchased or otherwise acquired YogaWorks common stock in the IPO, or pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO, and who were damaged thereby.  Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of the defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98.     The members of the Class are so numerous that joinder of all members is impracticable. There were 7.3 million shares were sold in the IPO. Since the IPO, the Company's common stock has actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by YogaWorks or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

100.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

102.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the 1933 Act was violated by defendants as alleged herein;

(b)     Whether the Registration Statement Offering Materials contained material misstatements, materially misleading statements and/or omitted material information required to be stated therein;

1    (c)    Whether certain defendants controlled primary violators within the

2    meaning of the 1933 Act; and

3    (d)    The extent to which members of the Class have sustained damages

4    and the proper measure of damages.

5    103.    A class action is superior to all other available methods for the fair and

6    efficient adjudication of this controversy since joinder of all members is

7    impracticable. Furthermore, as the damages suffered by individual Class members

8    may be relatively small, the expense and burden of individual litigation makes it

9    impossible for members of the Class to individually redress the wrongs done to them.

10   There will be no difficulty in the management of this action as a class action.

11                              **FIRST CAUSE OF ACTION**

12                   **Violation of Section 11 of the 1933 Act Against**
                     **All Defendants Except Great Hill Partners**

13

14   104.    Plaintiff repeats and incorporates each and every allegation contained

     above as if fully set forth herein.

15

16   105.    This Cause of Action is brought pursuant to §11 of the Securities Act, 15

17   U.S.C. §77k, on behalf of the Class, against all defendants.  This is a non-fraud cause

     of action.  Plaintiffs do not assert that defendants committed intentional or reckless

18   misconduct or that defendants acted with scienter or fraudulent intent.

19

20   106.    The Registration Statement for the IPO was inaccurate and misleading,

21   contained untrue statements of material facts, omitted to state other facts necessary to

22   make the statements made not misleading and omitted to state material facts required

     to be stated therein.

23

24   107.    Defendants are strictly liable to Plaintiffs and the Class for the

     misstatements and omissions.

25

26   108.    None of the defendants named herein made a reasonable investigation or

27   possessed reasonable grounds for the belief that the statements contained in the

28

Registration Statement were true and without omissions of any material facts and were not misleading.

109.    By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated §11 of the 1933 Act.

110.    Lead Plaintiff acquired YogaWorks common stock pursuant and/or traceable to the Registration Statement for the IPO.

111.    Lead Plaintiff and the Class have sustained damages pursuant to §11(e) of the 1933 Act.   In addition, as a result of the materially misleading Offering Materials, YogaWorks' share price was inflated at the time of the IPO through which YogaWorks raised approximately $40.15 million in gross proceeds.

112.    At the time of the purchase of YogaWorks common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.   Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action.   Less than three years has elapsed between the time that the common stock upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

### SECOND CAUSE OF ACTION

### Violation of Section 12(a)(2) of the 1933 Act Against
### The Company, The Executive Defendants, and The Underwriter Defendants

113.    Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

114.    This Cause of Action is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against the Company, the Executive Defendant and the Underwriter Defendants.

- 45 -

115.   This Cause of Action does not sound in fraud.  Lead Plaintiff does not allege that the Company, the Executive Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

116.   By means of the defective Prospectus and other conduct alleged herein, including oral and written communications made by the Company, the Executive Defendants and Underwriter Defendants in connection with the Company's road show, defendants promoted and sold YogaWorks stock to Lead Plaintiff and other members of the Class, for defendants' own financial benefit and the financial benefit of their associates.  The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase shares in the IPO.  Lead Plaintiff was solicited by at least one member of the underwriting syndicate, defendant Stephens Inc., and purchased from that Underwriter Defendant.

117.   The Prospectus and road show communications contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above.  Defendants owed Lead Plaintiff, and the other members of the Class who purchased YogaWorks common stock pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

118.   Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Lead Plaintiff have known, of the untruths and omissions contained in the Prospectus, at the time Lead Plaintiff acquired YogaWorks common stock.

119.   By reason of the conduct alleged herein, defendants named herein violated §12(a)(2) of the 1933 Act.  As a direct and proximate result of such

- 46 -

violations, Lead Plaintiff and the other members of the Class who purchased YogaWorks common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of stock. Accordingly, Lead Plaintiff and the other members of the Class who purchased YogaWorks common stock issued pursuant to the Prospectus seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein.

120. This Action is brought within three years from the time that the common stock upon this Count is brought were sold to the public, and within one year from the time when Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

## THIRD CAUSE OF ACTION

### Violation of Section 15 of the 1933 Act Against
### The Individual Defendants and Great Hill Partners Defendants

121. Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

122. This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and the Great Hill Partners Defendants.

123. The Individual Defendants each were control persons of YogaWorks by virtue of their positions as directors and/or senior officers of YogaWorks as of the IPO. The Great Hill Partners Defendants each had the ability to influence the policies and management of YogaWorks by their voting and dispositive control over YogaWorks at all relevant times by common stock ownership, pre-IPO agreements and by having their designated directors serving on the board of YogaWorks. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of YogaWorks. The Great Hill Partners Defendants were not only control persons of YogaWorks by virtue of their ownership of YogaWorks common stock, Board

- 47 -

1 membership, "services" provided YogaWorks, relationships with management and

2 involvement in establishing YogaWorks' management and board, they also had

3 extensive contractual rights regarding YogaWorks' governance, capitalization and

4 ability to finance, including, but not limited to, rights to cause the IPO.

5     124.    The Great Hill Partners Defendants had a financial interest in taking the

6 Company's stock public in order to increase the holding value and marketability of

7 their investment.  Defendant YogaWorks, the Great Hill Partners Defendants and the

8 Individual Defendants were each critical to effecting the IPO, based on their signing

9 or authorization of the signing of the Registration Statement, by voting (including

10 voting their shares) to execute the IPO and by having otherwise directed through their

11 authority the processes leading to execution of the IPO, including obtaining the

12 Underwriter Defendants, registration, qualification, authorization, pricing, offering to

13 the public and issuance and sale of the shares in the IPO.

14     125.    By virtue of the conduct alleged herein, the defendants named in this

15 Cause of Action are liable for the aforesaid wrongful conduct and are liable to Lead

16 Plaintiff and the Class for damages suffered.

17     WHEREFORE, Plaintiff prays for relief and judgment, as follows:

18     A.    Determining that this action is a proper class action and certifying Lead

19 Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

20 Procedure and Lead Plaintiff's counsel as Lead Counsel;

21     B.    Awarding compensatory damages in favor of Lead Plaintiff and the other

22 Class members against all defendants, jointly and severally, for all damages sustained

23 as a result of defendants' wrongdoing, in an amount to be proven at trial, including

24 interest thereon;

25     C.    Awarding rescission or a rescissory measure of damages to the extent

26 permitted under the claims asserted herein;

27     D.    Awarding Lead Plaintiff and the Class their reasonable costs and

28 expenses incurred in this action, including counsel fees and expert fees; and

1    E.    Awarding such equitable/injunctive or other and further relief as the

2 Court may deem just and proper.

3                           **JURY TRIAL DEMANDED**

4    Lead Plaintiff hereby demands a trial by jury.

5 DATED:  May 21, 2019                    ROBBINS GELLER RUDMAN
                                              & DOWD LLP
6                                        JAMES I. JACONETTE
                                         DANIELLE S. MYERS
7                                        TRICIA L. McCORMICK
                                         JUAN CARLOS SANCHEZ
8

9                                            s/ James I. Jaconette
10                                        JAMES I. JACONETTE

11                                       655 West Broadway, Suite 1900
                                         San Diego, CA  92101
12                                       Telephone:  619/231-1058
                                         619/231-7423 (fax)
13                                       jamesj@rgrdlaw.com
                                         danim@rgrdlaw.com
14                                       triciam@rgrdlaw.com
                                         isanchez@rgrdlaw.com
15
                                         Lead Counsel for Lead Plaintiff
16
                                         THE ROSEN LAW FIRM, P.A.
17                                       LAURENCE M. ROSEN (SBN 219683)
                                         355 South Grand Avenue, Suite 2450
18                                       Los Angeles, CA 90071
                                         Telephone:  213/785-2610
19                                       213/226-4684 (fax)
                                         lrosen@rosenlegal.com
20
                                         Attorneys for Plaintiff Craig Cohen
21

22

23

24

25

26

27

28

- 49 -

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify under penalty of perjury that on May 21, 2019, I authorized the

3

electronic filing of the foregoing with the Clerk of the Court using the CM/ECF

4

system which will send notification of such filing to the e-mail addresses on the

5

attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of

6

the foregoing via the United States Postal Service to the non-CM/ECF participants

7

indicated on the attached Manual Notice List.

8

  s/ James I. Jaconette

JAMES I. JACONETTE

9

10

ROBBINS GELLER RUDMAN
   & DOWD LLP

11

655 West Broadway, Suite 1900
San Diego, CA  92101

12

Telephone:  619/231-1058
619/231-7423 (fax)

13

14

E-mail:  JamesJ@rgrdlaw.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 2:18-cv-10696-CJC-SK Craig Cohen v. YogaWorks, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com

- **Joshua G Hamilton**
  joshua.hamilton@lw.com,shirin.behrooz@lw.com,sandra.sudduth@lw.com,joshua-hamilton-8581@ecf.pacerpro.com

- **Setareh Homayoni**
  setareh.homayoni@lw.com

- **Kendall Madison Howes**
  kendall.howes@lw.com

- **James I Jaconette**
  jamesj@rgrdlaw.com,DawnC@rgrdlaw.com,e_file_sd@rgrdlaw.com,9891662420@filings.docketbird.com,creis@rgrdlaw.com

- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,3045517420@filings.docketbird.com,e_file_sd@rgrdlaw.com

- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com

- **Laurence M Rosen**
  lrosen@rosenlegal.com

- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com

- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`