ROBBINS GELLER RUDMAN
& DOWD LLP
JAMES I. JACONETTE (179565)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jamesj@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re YOGAWORKS, INC. SECURITIES LITIGATION | Master File No. 2:18-cv-10696-CJC-SK (Consolidated with 2:19-cv-00970-CJC-SK) |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

Lead Plaintiff Inter-Local Pension Fund GCC/IBT ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this complaint the following upon knowledge with respect to Lead Plaintiff and Lead Plaintiff's own acts, and upon facts obtained through an investigation conducted by Lead Plaintiff's counsel, which included, among other things, a review and analysis of relevant filings made by YogaWorks, Inc. ("YogaWorks" or the "Company") with the United States Securities and Exchange Commission (the "SEC"), Company press releases and conference calls, public statements issued by defendants, media reports, analyst reports, industry reports and consultation with persons familiar with Yogawork's business. Lead Plaintiff believes substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION & OVERVIEW

1. This is a federal securities class action on behalf of all persons and entities, other than defendants, who purchased YogaWorks common stock pursuant and/or traceable to the Company's initial public offering that commenced on or about August 10, 2017 and closed on August 16, 2017 (the "IPO"), seeking to recover compensable damages caused by defendants' violations of the Securities Act of 1933 (the "1933 Act") (the "Class").

2. YogaWorks started as a single yoga studio in Santa Monica in 1987. As of July 2014, when it was acquired by private equity firm Great Hill Partners (defined herein), YogaWorks had 29 studios. Great Hill Partners nearly doubled the number of studios in just three years, and took the Company public in an attempt to exit its investment. During that period of time, Great Hill Partners replaced the YogaWorks C-Suite, established the Board of Directors (the "Board") with its employees, Chief Executive Officer ("CEO") and two "independent" directors, and implemented extensive cost-cutting measures that reduced pay and eliminated positions across the organization. Studio and regional managers had to make choices

between quality staffing and management and keeping studios clean. Class quality and customer experience declined as a result of disruption and other changes from the aggressive cost-cutting, and so too did visits to many of the studios. The business and financial metrics suffered as a result.

3. YogaWorks started selling class packages, which cost more than monthly memberships, to increase cash flow in advance of the IPO in an attempt to build a pipeline of studio acquisitions. The studios acquired were not the profitable studios YogaWorks added before being acquired by Great Hill Partners. Financial metrics continued to decline. Within a year of the IPO, the Company was privately suffering from sequential and year-over-year declining measures of revenue, profitability and studio visits.

4. YogaWorks filed its draft registration statement on SEC Form S-1 on April 18, 2017. On July 17, 2017, defendant Chang, on behalf of YogaWorks and defendants Cowen, Stephens and Guggenheim, on behalf of the Underwriter Defendants (defined herein), wrote separately to the SEC to request that YogaWorks' Registration Statement be accelerated and declared effective as of July 19, 2017. Unsuccessful in that request, the IPO commenced the next month pursuant to a Registration Statement and Prospectus dated August 10, 2017 (collectively, the "Registration Statement"), half-way into the Company's third quarter. The IPO pitch was that YogaWorks had recently grown through a successful acquisition strategy. The Company was supposedly successful because it had strong "studio-level economics" combined with studio acquisitions that return invested capital in two to four years, and an infrastructure that could be leveraged so that as the studio base was growing, expenses for corporate and regional overhead were becoming a smaller percentage of net revenues and profitability. The IPO was priced at $5.50 per share. 7.3 million shares sold.

5. The Registration Statement contained material misstatements and misleading statements that suffered from the omission of significant information.

The Company's business model was not working. And the Registration Statement and Prospectus omitted material facts concerning existing studio-level profitability, the Company's acquisition pipeline and the reasons for declining financial performance. Investors accepted the Company's excuse in the Registration Statement and Prospectus and after the IPO that revenues were temporarily flat because of a shift in sales mix that would be beneficial long term. But that was a misstatement. The sales mix shift was to "grab" cash and declining customer experience and class quality was negatively impacting revenues. The omitted information was important.

6. In YogaWorks' maiden quarter, half-way complete as of the IPO, the risks omitted from the Registration Statement and Prospectus further materialized, and the Company quietly and slowly began its spiral towards a liquidity crisis. By the end of the year, investors lost over 50% of their investment and YogaWorks was described as possibly the worst IPO of the year. But the Company remained positive and securities analysts employed by the Underwriter Defendants (defined herein) kept price targets and "Buy" ratings locked in place as they reinforced the Company's benign explanations for its performance.

7. A year after the IPO, unable to credibly blame negative results on a "sales-mix shift," and having decreased sales promotions that were masking existing studio performance, the Company admitted its base business was suffering. As YogaWorks became a "penny stock," the Underwriter Defendants' analysts finally downgraded the Company and took back their astronomical price targets.

`




8. As one independent analyst wrote on August 19, 2018:

> [T]here's only $15.5 million of cash remaining to support YogaWorks' spending spree. If YogaWorks' current cash burn run rate holds, it has barely over a year left of operations before it has to raise additional capital. With shares trading near pink-sheet territory, raising equity capital seems to be out of the question. On the credit side, only the riskiest of venture-debt lenders would want to lend to an unprofitable company like this - and even if YogaWorks were able to pull that off, it would come at a crippling interest rate. . . . In my view, this company is headed into the ground.

Shortly afterwards, the National Association of Securities Dealers Automated Quotations ("NASDAQ") threatened delisting.

9. On May 14, 2019, YogaWorks filed its quarterly report on SEC Form 10-Q for the quarter ended March 31, 2019, which revealed the Company had $6 million of cash remaining and a burn rate of $4.6 million a quarter, as confirmed by

the CEO on the "earnings" conference call. The report on Form 10-Q states: "[W]e had negative working capital of $4.0 and $0.6 million at March 31, 2019 and December 31, 2018, respectively . . . the Company needs additional financing to fund its operations. These conditions raise substantial doubt about our ability to continue as a going concern."

10. On July 25, 2019, the Company delisted its stock from the NASDAQ Capital Market. On August 1, 2019, NASDAQ permanently suspended trading of the Company's common stock. And on August 5, 2019, the Company filed SEC Form 15 giving notice that it was terminating registration and suspending its duty to file reports under federal securities laws.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the 1933 Act (15 U.S.C. §§77k, 77l, and 77o).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act (15 U.S.C. §77v).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) as the alleged misleading public filings and press releases entered this district and the Company's headquarters are located in this district.

14. Defendants' wrongful acts also arose in, were directed in and emanated from, in part, this District, including (but not limited to) the direction of processes leading to execution of the IPO, dissemination of materially misleading statements into this District, the purchase of the Company's common stock by members of the Class who reside in this District and the sale of the Company's common stock in this District by certain of the Underwriter Defendants.

15. In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16. Lead Plaintiff Inter-Local Pension Fund GCC/IBT, as described in the certification previously submitted to the Court, and incorporated herein, purchased YogaWorks common stock pursuant to the Registration Statement in the Company's IPO and was damaged thereby. Lead Plaintiff purchased those shares from defendant Stephens Inc., in response to being invited to indicate interest in the IPO by representatives of Stephens Inc., at the behest of YogaWorks.

17. YogaWorks is a Delaware corporation with principal executive offices located at 5780 Uplander Way, Culver City, California 90230. YogaWorks common stock traded on NASDAQ under the ticker symbol "YOGA" before being delisted. YogaWorks is subject to liability as an issuer, seller and control person, and all the statements and solicitation herein made by YogaWorks' officers were on behalf of YogaWorks. YogaWorks designated numerous personnel in the working group for the IPO, including its CEO and CFO, both of whom not only reviewed and approved the offering documents, but also participated in the preparation of road show presentations according to a power point and talking points/script that was reviewed and approved by them. YogaWorks' representatives at the road show pitched investors in the IPO in related meetings, calls and webcasts.

18. Defendant Rosanna McCollough ("McCollough") is the Company's President, CEO and member of the Board and held these positions at the time of the IPO. As the top YogaWorks executive in the IPO working group, McCollough reviewed and approved, and participated in making statements in the Registration Statement. She also reviewed, edited and approved the IPO's road show power point presentation and road show talking points and script, and she participated in making the false and misleading statements alleged herein at the road show as YogaWorks' CEO. McCollough was motivated by the financial implications of an IPO for YogaWorks and its controlling shareholder Great Hill Partners, as well as for herself. By the IPO, Great Hill Partners obtained liquidity for its investment in the Company

and was repaid approximately $3.3 million in connection with Great Hill Partners convertible notes under which the Company was indebted. McCollough owned over 250,000 shares of common stock in the Company, including shares directly held as well as shares issuable upon the exercise of options exercisable as of the IPO or less than 60 days after the IPO. She also was granted over 196,000 shares of common stock in connection with the IPO at a price of $0.00 per share pursuant to restricted stock units, over 50% of which were vested as of the IPO.

19. Defendant Vance Chang ("Chang") is YogaWorks' Chief Financial Officer ("CFO") and held this position at the time of the IPO. As the number two YogaWorks executive in the IPO working group, Chang reviewed and approved, and participated in making statements in the Registration Statement. He also reviewed, edited and approved the IPO's road show power point presentation and road show talking points and script, and he participated in making the false and misleading statements alleged herein at the road show as YogaWorks' CFO. Chang was motivated by the financial implications of an IPO for YogaWorks and its controlling shareholder Great Hill Partners, as well as for himself. Chang owned over 205,000 shares of common stock in the Company, including shares directly held as well as over 72,000 shares issuable upon the exercise of options exercisable as of the IPO or less than 60 days after the IPO. He also was granted over 108,000 shares of common stock in connection with the IPO at a price of $0.00 per share pursuant to restricted stock units, over 25% of which were vested as of the IPO.

20. Defendant Peter L. Garran ("Garran") serves at the Chairman of the Board of YogaWorks, he held this position at the time of the IPO and was also appointed to the Company's Audit Committee following the IPO. Defendant Garran was caused to be elected to the Board by Great Hill Partners to serve at the favor of the Great Hill Partners entities, identified in ¶26 below, and he did and does so as a Partner at Great Hill Partners, L.P. Acting in part on behalf of those entities, Garran also approved McCollough's compensation as well as Chang's compensation

(including the compensation of each executive officer of the Company), and performed the critical processes leading to execution of the IPO.

21. Defendant Michael A. Kumin ("Kumin") serves as a Director of the Board and was a Director at the time of YogaWorks' IPO. Defendant Kumin was caused to be elected to the Board by Great Hill Partners to serve at the favor of the Great Hill Partners entities, identified in ¶26 below, and he did and does so as Managing Partner at Great Hill Partners, L.P., manager of GHP V, LLC, and manager of Great Hill Investors, LLC. GHP V, LLC is the sole general partner of the sole general partner of Great Hill Equity Partners V, L.P., which held 99.9% of the Company's stock as of the IPO, and which Kumin beneficially owned. Acting in part on behalf of those Great Hill and GHP entities, Kumin also approved McCollough's compensation as well as Chang's compensation (including the compensation of each executive officer of the Company) and performed the critical processes leading to execution of the IPO.

22. Defendant Michael J. Gerend ("Gerend") serves as a Director of the Board, was a Director at the time of YogaWorks' IPO and was appointed Chairman of the Compensation Committee and a member of the Audit Committee following the IPO. Defendant Gerend was caused to be elected to the Board by Great Hill Partners.

23. Defendant Brian T. Cooper ("Cooper") serves as a Director of the Board, was a Director at the time of YogaWorks' IPO and was appointed Chairman of the Audit Committee and a member of the Compensation Committee following the IPO. Defendant Gerend was caused to be elected to the Board by Great Hill Partners.

24. The defendants identified in ¶¶18-23 above signed the false and misleading Registration Statement used to conduct the IPO and are referred to herein as the "Individual Defendants." The defendants referenced above in ¶¶18-19 are key members of the IPO working group and executives of YogaWorks who pitched

investors in the road show to sell the IPO at the behest of the Company and the Underwriter Defendants, and are sometimes referred to herein as the "Executive Defendants." Defendant Yogaworks and the Individual Defendants are strictly liable for the false and misleading statements in the Registration Statement.

**UNDERWRITER DEFENDANTS**

25. Defendants Cowen and Company, LLC ("Cowen"), Roth Capital Partners, LLC ("Roth"), Stephens Inc. ("Stephens"), Guggenheim Securities, LLC ("Guggenheim") and Imperial Capital, LLC ("Imperial") (collectively referred to as the "Underwriter Defendants") served as underwriters for the IPO, sold 7.3 million shares of YogaWorks common stock in the IPO and collectively received over $2.8 million in fees and commissions for soliciting and selling the shares in the IPO. Pursuant to the 1933 Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses which specialize, inter alia, in underwriting IPOs of securities. They served as the underwriters of the IPO and shared more than $2.8 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize YogaWorks stock in the IPO, and as stated in the Registration Statement they "propose[d] to offer the shares of common stock to the public as the public offering price set forth on the cover of [the] prospectus," $5.50 per share. In the bakeoff that determined the composition of the underwriting syndicate, the Underwriter Defendants extolled their ability to market YogaWorks common stock. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates and counsel to market the Company's stock, and those personnel worked on and approved the content of YogaWorks' Registration Statement and road show presentation. The Underwriter Defendants arranged a multi-city road show prior to the IPO during which they, and the Executive Defendants, met with potential

investors and presented highly favorable information about the Company, its operations and its financial prospects. The Underwriter Defendants also promoted YogaWorks' IPO to their bank's own clients and sold shares to those clients and brokerage account holders.

(b) The Underwriter Defendants also demanded and obtained an agreement from the Company that YogaWorks would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that YogaWorks had purchased millions of dollars in directors' and officers' liability insurance.

(c) Representatives of the Underwriter Defendants also assisted YogaWorks and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of YogaWorks, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning YogaWorks' operations and financial prospects.

(d) In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with YogaWorks' management, top executives and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which YogaWorks stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about YogaWorks would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and YogaWorks' management and top

executives, the Underwriter Defendants knew, or should have known, of YogaWorks' existing problems as detailed herein.

(e) The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Lead Plaintiff and the other members of the Class.

**CONTROL DEFENDANTS GREAT HILL PARTNERS**

26. Defendant Great Hill Partners, L.P., through its subsidiaries and/or affiliated companies, including defendant GHP V, LLC, defendant Great Hill Equity Partners V, L.P. (collectively, "Great Hill Partners") and Great Hill Investors, LLC, acquired YogaWorks in July 2014. Great Hill Partners (and each of the entities defined therein) controlled YogaWorks and certain of the Company's directors. GHP V, LLC is the sole general partner of the sole general partner of Great Hill Equity Partners V, L.P., which held 99.9% of the Company's stock as of the IPO and 71.5% of the outstanding shares of YogaWorks as of August 28, 2018.

27. Once Great Hill Partners acquired the Company, it wielded significant influence over the management and operations of the Company. Great Hill Partners replaced the CEO, CFO and Chief Operating Officer ("COO"), eliminated and replaced a number of management positions, and instituted an aggressive cost-cutting program that eliminated or backfilled management, staff and teaching positions across the organization. The IPO was understood at the outset to provide Great Hill Partners its investment exit by providing liquidity and payment to Great Hill Partners. The officers and directors that Great Hill Partners put on the board understood that. Great Hill Partners was recognized within the Company as being responsible for replacing monthly dues with class packages and changing the structure of studio management. In addition to this, Great Hill Partners caused the Company to enter an agreement whereby Great Hill Partners would provide general management, consulting and advisory services to the Company. The agreement

included payment for those services, including but not limited to Great Hill Partners services related to attending and participating at board meetings, advising on studio acquisitions, developing and supervising the Company's capital structure and strategies for increasing financial performance. Indeed, Great Hill Partners was recognized within the Company as being responsible in part for decreasing studio quality, class attendance and quality, as well as studio profitability.

28. As stated in the Registration Statement, Great Hill Partners "will be able to exercise a controlling influence over matters requiring stockholder approval, including the election of directors and approval of significant corporate transactions, and have significant influence over [YogaWorks'] management and policies for the foreseeable future." The influence over the management and operations of the Company by Great Hill Partners was (and continues to be) so great that the Company's directors and top officers that Great Hill Partners controls and influences, under the Company's certificate of incorporation, may pursue opportunities directly in conflict with the Company. As stated in the Registration Statement:

> Our certificate of incorporation will provide for the allocation of corporate opportunities between us and Great Hill Partners. Under these provisions, neither Great Hill Partners, its portfolio companies, funds or other affiliates, nor any of their officers, directors, agents, stockholders, members or partners will have any duty to refrain from engaging, directly or indirectly, in the same business activities, similar business activities or lines of business in which we operate. . . . [S]uch . . . opportunities may not be available to us.

29. Great Hill Partners has executive offices in Boston, Massachusetts. Great Hill Partners, through Kumin and Garran, as well as McCollough and Chang (over whom Great Hill Partners wielded considerable influence), and Great Hill Partners employees, directed and participated in the steps critical to effecting the

IPO by traveling to California to participate in board, board committee and management activities, or by directing substantial communications into California for the purpose of controlling the Company and executing the IPO. These activities included, but were not limited to, review, approval, signing or authorization of the signing of the Registration Statement, voting (including voting their shares) to execute the IPO and by having otherwise directed through the Great Hill Partners' authority processes leading to execution of the IPO, including retaining the Underwriter Defendants, registration, qualification, authorization, pricing, offering to the public and issuance and sale of the shares in the IPO.

30. YogaWorks, the Individual Defendants, the Underwriter Defendants and Great Hill Partners are collectively referred to herein as, "defendants."

## SUBSTANTIVE ALLEGATIONS

### *Background*

31. Founded in 1987, YogaWorks was a single yoga studio in Santa Monica, California. Between 1996 and 2014, YogaWorks grew to 29 studios. In July 2014, Great Hill Partners acquired YogaWorks for $45.6 million in cash and added through its management and control, approximately 23 studios. Great Hill Partners currently owns approximately 70% of YogaWorks' outstanding common stock.

32. YogaWorks claims that it is "one of the largest and fastest growing providers of high quality yoga instruction in the U.S." and "the only national, multi-discipline yoga instruction company."

33. YogaWorks generates most of its revenue from offering a variety of yoga classes at its studios. The in-studio classes offer yoga instruction for all skill levels in various yoga styles. The prices for classes vary by location and region, but on average students pay $90-$145 per month for an unlimited membership. YogaWorks offers six-month and annual prepaid memberships, as well as class packages in increments of 10 to 20 classes.

34. YogaWorks also derives revenue from teacher training programs and online subscriptions of MyYogaWorks.com. The teacher training program began in 1990 and has graduated approximately 11,000 students. These graduates are considered "ambassadors of the YogaWorks brand." YogaWorks offers a 200-hour and a 300-hour training program, taught in 16 countries at YogaWorks studios as well as non-YogaWorks studios. Tuition for the 200-hour program is approximately $3,500 and for the 300-hour program is approximately $4,200. MyYogaWorks.com provides online subscriptions for access to YogaWorks' on-demand video library of over 1,100 classes. In 2017, MyYogaWorks.com streamed approximately 700,000 classes to over 25,000 users. YogaWorks charges $15 per month for the subscription which is reduced to $5 per month for those with YogaWorks studio memberships.

35. Profitable studio acquisitions are vital to YogaWorks' growth and financial viability, as since its inception, this was YogaWorks' focus.

36. At the time of the IPO, YogaWorks owned 50 studios in California, New York City, Boston and the Baltimore/Washington, D.C. area.

37. YogaWorks' growth is driven mainly through acquisition of yoga studios in highly fragmented markets. The Registration Statement stated, "[t]hrough acquisitions, we believe we can quickly gain students, grow our market share and build on the operating momentum of these acquired businesses."

38. YogaWorks' acquisition strategy is driven by its purported belief that acquisitions of existing studios that already have a student base is an "effective, profitable and risk-mitigating way to enter a new regional market" rather than building new studios and waiting for attendance to ramp up.

39. On June 23, 2017, YogaWorks filed a registration statement on SEC Form S-1 for a proposed initial public offering. The June 23, 2017 registration statement was followed by several amendments, the last of which was filed on August 10, 2017 which became effective that day. On August 11, 2017, YogaWorks filed a Prospectus pursuant to 17 C.F.R. 230.424(b)(4), which is incorporated into

the Registration Statement (the "Prospectus"), with the SEC. On August 16, 2017, YogaWorks completed its IPO in which it offered 7.3 million shares at $5.50 per share.

40. The Registration Statement stated the intended use of the IPO proceeds was for capitalization and financial flexibility, repayment of a $3.3 million note to Great Hill Partners and a $7 million loan to Deerpath Funding LP, funding an acquisition and for working capital and other general corporate purposes. The IPO reaped net proceeds of $35 million.

41. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading. Furthermore, it was not prepared in accordance with the rules and regulations governing its preparation.

**DEFENDANTS' DISCLOSURE OBLIGATIONS**

42. In their capacities as signers of the Registration Statement and/or an issuer, statutory seller, offeror, control persons and/or underwriter of the shares sold pursuant to the Registration Statement, each of the defendants are strictly liable for the misstatements and omissions alleged herein pursuant to §§11, 12(a)(2) and 15 of the 1933 Act.

43. Due to the materially deficient Registration Statement, defendants have also violated their independent, affirmative duty to provide adequate disclosures about adverse conditions, risk and uncertainties. Item 303 of SEC Registration S-K, 17 C.F.R. §229.303(a)(3)(ii), requires that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material unfavorable impact on the Company's operations.

44. Defendants further violated their independent, affirmative duty to adequately "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." In contravention to Item 503 of SEC Registration S-K, 17 C.F.R. §229.503(c), defendants failed to

disclose several risks that have already materialized at the time of the IPO that were unknown to Lead Plaintiff and other YogaWorks investors.

## MATERIAL MISSTATEMENTS, MISLEADING STATEMENTS AND OMISSIONS IN THE REGISTRATION STATEMENT

***Context***

45. The first section of the Prospectus, pages 1-12 (the "Prospectus Summary"), attached hereto as Ex. 1, presented YogaWorks as a successful, growing business with unique strengths. Statements included: "We are one of the largest and fastest growing providers of high quality yoga instruction in the U.S., with almost 3 million student visits in 2016 and 50 company-owned studios as well as our Internet-based digital media service, MyYogaWorks.com." It highlighted: "**Strong Financial Performance**."

> Our significant growth is reflected in:
>
> - 49 studios at December 31, 2016 reflecting a compound annual growth rate, or CAGR of 19.5%, from 24 studios at December 31, 2012 (primarily related to our acquisition of 17 studios in 2015);
> - 2.9 million visits in 2016, reflecting a CAGR of 13.6%, from 1.8 million visits in 2012; and
> - net revenues of $55.1 million in 2016, reflecting a CAGR of 10.9%, from $36.4 million in 2012.

46. The Prospectus Summary positively described "**Our Market Opportunity**," with such statements as:

> Yoga awareness among Americans has increased from 75% in 2012 to 90% in 2016, according to the 2016 Yoga in America Study. According to the same study, in 2016, yoga practitioners spent over $16 billion on instruction, apparel, equipment and yoga accessories; over one-third of that figure, or approximately $5.8 billion, was spent on instruction in

> 2016. At $16 billion in 2016, spend on yoga has increased by $6 billion since 2012.

In the "**Student Profile**," it stated: "Yoga is practiced by a number of desirable consumer demographics and YogaWorks is well positioned to reach a broad population due to our inclusive, multi-discipline and broad program offerings."

47. The Prospectus Summary also included "**What Sets Yogaworks Apart**," highlighting a "***High Quality Yoga Experience***," the "***Gold Standard of Yoga Teacher Training***" and "***Strong Studio-Level Economics***." YogaWorks was described as the "***Acquirer of Choice with a History of Successful Acquisitions***," and a "***Proven and Experienced Senior Management Team***."

48. The Prospectus Summary promoted YogaWorks' "**Growth Strategy**," with such statements as: "We believe we are ideally positioned to consolidate the highly fragmented yoga studio market." It also stated:

> Over the past 14 years, we have successfully integrated numerous acquisitions. . . . Through future acquisitions, we can leverage our corporate infrastructure to grow our brand in both new and existing markets by quickly tapping into the thriving yoga communities that already exist in nearly every city in the U.S.

As part of YogaWorks' growth strategy, the Prospectus Summary highlighted the Company was "***Driv[ing] Increased Visits, Net Revenues and Regional Market Share***," and that the Company benefitted from being able to "***Leverage our Infrastructure***" and "***Pursue Brand Extension Opportunities***."

49. The Prospectus Summary included multiple graphics, most of which depicted arrows with upward trajectories describing the Company's financial and operational performance. *See* Ex. 1 at 3-4.

50. Elsewhere in the Registration Statement, the information in the Prospectus Summary was repeated in a description of the Company's "**Business**," with similar and additional graphics and highlighted presentations. *See* Ex. 2 at

75-87. Within the context above and throughout, the Registration Statement suffered from material misstatements, misleading statements and omitted material facts.

***Material Misstatements, Misleading Statements and Omitted Material Facts***

51. In the Prospectus Summary, the Registration Statement highlighted "**Recent Developments**" that included "***Preliminary Second Quarter Results***." It stated: "Our financial statements for the quarter ended June 30, 2017 are not yet available." That was a misstatement. The Company's financial statements for the second quarter were in fact available and the Company was aware of them.

52. Thereafter, the Prospectus Summary presented "the following estimated results for the quarter ended June 20, 2017: Net revenues of between $12.3 million and $12.6 million; and Visits of between 700,000 and 720,000." It also purported to explain that:

> The decrease in net revenues from $13.3 million for the quarter ended June 30, 2016 was primarily due to a larger portion of our sales for the quarter ended June 30, 2017 being recognized as deferred revenue. . . . ***This sales mix shift resulted in less revenue being recognized during the second quarter of 2017 than the same quarter in 2016, in which we had a higher percentage of monthly membership revenue.***

Emphasis added. It also stated: "Our decision to offer class packages at all of our studios also impacted our number of visits, as students on class packages tend to visit studios less than students with memberships, which primarily led to the decrease from 754,567 visits for the quarter ended June 30, 2016." The discussion also included numerous "[f]actors" that could cause the "estimates to differ."

53. Indeed, a theme in the Registration Statement was that revenues and class visits in certain periods were temporarily declining due to a shift in business and pricing strategy towards selling more class packages, which would increase

business and even in the short term be offset by increased deferred revenue. The Registration Statement also stated:

> ***With the adoption of our more flexible pricing strategy in July 2016, our sales mix has shifted toward a higher number of class-package sales and a corresponding decline in monthly membership sales.*** We anticipate this trend to continue at a decreasing rate over time as students in our existing studios purchase class packages more frequently than memberships and as we acquire and open additional studios, and expect a more balanced mix between class packages and memberships over time. ***We expect that the impact of this shift in sales mix will be a reduction in the amount of revenue recognized in a given period by an increase in deferred revenue liability associated with class package sales, as well as a decrease in student visits, as students on class packages tend to visit studios less than students with membership.***

Emphasis added.

54. And with respect to studio visits, the Registration Statement stated:

> ***Our decision to offer class packages at all of our studios also impacted our number of visits***, as students on class packages tend to visit studios less than students with memberships, which primarily led to the decrease from 754,567 visits for the quarter ended June 30, 2016. ***We anticipate this trend to continue at a decreasing rate over time as students in our existing studios purchase class packages more frequently than memberships and as we acquire and open additional studios, and expect a more balanced mix between class packages and memberships over time***. While our strategy to sell more class packages has had an impact on both our net revenues and visits during the transition period, we believe the implementation of this strategy allows

> us to better serve our students and will draw a broader student base as consumers favor more flexible pricing options.

Emphasis added.

55. The above statements in ¶¶52-54 were materially false and misleading when made and omitted material facts. It was internally understood at the Company that the shift to class packages was made in advance of the IPO to increase cash flow, as package prices were greater than monthly membership charges. And this was ***not*** a matter of a "sales mix shift" or "shift in sales mix." The relationship of deferred revenue to lost membership revenue was not as described, for revenue had been decreasing as a result of other factors. Cost-cutting measures instituted since Great Hill Partners acquired YogaWorks were negatively impacting class quality and customer experience, which was decreasing visits and revenues. Those measures included cutting pay and reducing management and employee headcount or backfilling positions with lower paid, lesser qualified employees across the organization. Cleaning costs were cut and cleaning labor was reduced as well. These matters significantly impacted class and studio quality, thereby alienating students and reducing revenues and classes per studio.

56. The Registration Statement asserted: "As a result of our quality class offerings, talented teachers and solid brand reputation, we have achieved a strong historical financial performance." This was emphasized with statements including "we have a proven history of retaining and improving the student and teacher focus of each studio or chain of studios acquired." Those statements were materially false and misleading and omitted material facts, for the reasons stated above in ¶55 and as follows. Cost cutting had reduced staff (including teachers) at studios and reduced management across the organization. Positions were backfilled with lesser paid and lesser qualified staff, teachers and management. The resulting class disruption and diminished quality from cost cutting had been consistently and significantly reducing visits per class Company-wide for over a year. Not only did that reflect

adversely on the YogaWorks "brand," it was having a corresponding negative effect on revenue and Studio-Level EBITDA. Thus, as of the IPO, organic growth from the factors the Registration Statement touted was not occurring.

57. The Registration Statement stated YogaWorks would benefit from economies of scale and from centralized management and less overhead per capita. Further, defendants stated that YogaWorks had a corporate infrastructure in place to support its future acquisition growth such that as YogaWorks grew, its overhead costs would become a smaller percentage of revenue of profitability, stating in relevant part:

> ***Leverage our Infrastructure***
>
> In preparation for our continued growth, we have built out our corporate infrastructure over the past several years. We now have the corporate, regional and studio-level management personnel in place, as well as the information technology platform, to support our future growth and acquisition strategy, without significant new investments in corporate infrastructure.

58. Additionally, the Registration Statement asserted that strong studio-level economics would allow it to achieve economies of scale, thereby reducing overhead costs as a percentage of revenue, stating in relevant part:

> As our studio base grows, expenses for our corporate and regional overhead should become a smaller percentage of our net revenues and profitability.

59. The above statements in ¶¶57-58 were materially false and misleading when made and omitted material facts. At the time of the IPO, YogaWorks' corporate overhead expenses were increasing as a percentage of sales and profitability because the Company's cost-cutting strategy was killing sales. In addition, because the Company had been backfilling regional and studio level management positions with lesser paid, lesser qualified personnel, it was causing

disruption and necessitating training, which in turn was increasing costs. Moreover, as of the IPO, the Company was also acquiring multiple smaller, less efficient studios that generated revenue substantially below the $500,000 to $700,000 level the Registration Statement identified. As a result, as of the IPO the Company was incurring increased expenses without corresponding revenue, and indeed in that third quarter of 2017 (half of which was over at the time of the IPO) YogaWorks incurred "[o]ther general and administrative expenses" of $3.1 million, or 22.6% of net revenue as compared to $2.5 million for the same quarter of 2016, or 18.2% of revenue.

60. The Registration Statement represented that YogaWorks had "strong studio-level economics" as a result of targeting studios with average annual revenues of at least $500,000 and a return of capital within two to four years of opening the new studio, stating in relevant part:

> Strong Studio-Level Economics
>
> We seek to generate attractive studio-level margins by increasing the average number of students per class which in turn provides better return on our fixed costs, such as teacher salaries and rent. ***We target studios with average annual revenues between $500,000 to $700,000 and a return on our invested capital to be within two to four years of opening a new studio. We approach our acquisition targets seeking similar returns***. We believe that our strong studio-level economics are important for us to grow our studio base and successfully execute our acquisition strategy.

Emphasis added.[1]

---

[1] In order to obtain a complete return on invested capital within two to four years, the studio-level EBITDA margins would have to be at least 20%, Conference Presentation, YogaWorks' at the 4th Annual Cowen's Future of the Consumer Conference, 18 (April 3, 2018), https://ir.yogaworks.com/static-files/1624037d-bee7-473a-9e28-08776ae8aade.

61. The above statements in ¶60 were materially false or misleading and omitted material facts when made. As of the IPO, YogaWorks had not been acquiring studios with the economics that it reported. As a result of YogaWorks' deteriorating financial position before the IPO, it had begun acquiring smaller, less efficient studios that did not meet the criteria set forth in the Registration Statement of generating $500,000 to $700,000 in revenue per year. And it had smaller, less efficient studios in its pipeline. For the third quarter 2017, YogaWorks acquired only three new studios for a total of $445,000.

62. Indeed, the pipeline of acquisitions YogaWorks had as of the IPO significantly contributed to Studio-Level EBITDA margin declines below the necessary return threshold for the third quarter of 2017, fourth quarter of 2017, first quarter of 2018 and second quarter of 2018 – in particular 19.2%, 18.6%, 18.1% and 14.8%, respectively.

63. The Registration Statement stated that the Company's "leverageable infrastructure," "studio acquisition experience" and "tested integration procedures," among other things, enabled YogaWorks to "***preserve the acquired studio's unique appeal to its local community while successfully increasing visits and net revenues under our ownership***." Emphasis added. That statement was materially misleading because it omitted material facts concerning the reasons for the Company's then-present acquisition economics and studio-level performance, as set forth in ¶¶55-56, 59, 61 above. Furthermore, overall visits per class and overall Studio-Level profitability was consistently declining because Yogaworks' corporate leverage strategy was ***not*** preserving studio appeal. In fact, class disruption and backfilled management and teacher positions, as well as other cost-cutting effects (*e.g.*, less studio cleaning) were adversely affecting customer experience, class quality, and overall studio appeal.

64. The Registration Statement contained pages and pages of numerous generalized possible "Risk Factors" that "***could***" possibly occur in the future and if

they did actually occur, "***could*** have a material adverse effect on [YogaWorks'] business." Those statements were false or misleading and omitted material information because at times what was presented as possible "risks" that "could" happen were matters that had already materialized and were then-presently significantly adversely impacting the Company as of the IPO.

65. The Registration Statement stated:

> ***Our growth strategy is highly dependent on our ability to successfully identify and acquire studio targets and integrate their operations with ours.***
>
> Our growth strategy primarily contemplates expansion through targeted acquisitions of other yoga studio businesses. Implementing this strategy depends on our ability to successfully identify opportunities that complement our businesses, share our business and company philosophy and operate in markets that are complementary to our operations and the communities in which we operate. We will also need to assess and mitigate the risk of any target opportunity, to acquire targets on favorable terms and to successfully integrate their operations with ours. ***We may not be able to successfully identify opportunities that meet these criteria, or, if we do, we may not be able to successfully negotiate, finance, acquire and integrate them. Even if we enter into confidentiality agreements or letters of intent with potential studios, we may not be able to complete the acquisition. If we are unable to identify and acquire suitable studios, our revenue growth rate and financial performance may fall short of our expectations. If we are successful in acquiring studio targets, we may not be able to successfully integrate the operations of these studios with ours, to execute the growth objectives of our combined operations or to realize the revenue opportunities or cost savings that may be assumed.*** In

> addition, any such opportunity may require us to raise additional capital, which may be dilutive to our existing shareholders, or require us to incur additional indebtedness. ***If our analysis of the suitability of a studio or group of studios for acquisition is incorrect, we may not be able to recover our capital investment in acquiring such studios***.

Emphasis added.

66. It also stated:

> Our recently acquired or newly opened studios ***may*** negatively impact our financial results in the short-term, and ***may*** not achieve sales and operating levels consistent with our existing studios on a timely basis, or at all.

67. The statements above in ¶¶65-66 were materially false and misleading because, as shown in ¶¶59, 61-62 above, the Company had ***already*** been acquiring studios that ***did not*** meet the Company's "criteria" and were not "suitable studios" (¶60 & n.1) as concerned financial performance, and such acquired studios as well as studios in the pipeline were ***already not*** generating revenues sufficient "to recover [YogaWorks'] capital investment." In addition, the Company was ***already*** suffering from an inability to achieve "cost savings" that it was assuming, as demonstrated in ¶¶59, 62 above.

68. The Registration Statement also stated:

> ***If we fail to attract new students and teachers and retain existing students and teachers, it could have an adverse impact on our growth strategy as we may not be able to increase the number of visits to our studios or students that go through our teacher training.***
>
> The performance of our studios and success of our growth strategy is largely dependent on our ability to continuously attract new students and teachers and retain existing students and teachers. We cannot be sure that we will be successful in these efforts, or that visits

> to our studio classes and teacher trainings or participation in MyYogaWorks.com will not materially decline. There are numerous factors that could lead to a decline in visits at established studios or that could prevent us from increasing our student visits at newer or acquired studios, including harm to our reputation, a decline in our ability to deliver quality yoga classes and teacher trainings at a competitive cost, the opening or acquisition of new studios or hosting of additional teacher trainings that may have the potential to cannibalize store sales in existing areas, the heightened presence of direct and indirect competition in the areas in which the studios are located, the decline in the public's interest in fitness through yoga, a deterioration of general economic conditions and a change in consumer spending preferences or buying trends. As a result of these factors, we cannot be sure that our student visits will be adequate to maintain or permit the expansion of our operations. ***A decline in student visits levels may have a material adverse effect on our business, financial condition, results of operations and growth rate***.

Emphasis added.

69. Those statements in ¶68 above were materially false and misleading because, as of the IPO, student visits were ***already*** consistently declining in sequential and year-over-year quarters, for the reasons stated at ¶¶55-56 above. One of the reasons for that was that the Company had been for years replacing teachers, staff and management with lesser paid, less qualified personnel as part of the Company's cost-cutting strategy. Consequently, materially declining student visits were ***already*** having a material adverse effect on YogaWorks, as shown in ¶¶55, 62 above, for revenues had been declining in in part as a result of declining class quality and customer experience.

70. The Registration Statement also stated:

> We may expand into markets where we have little or no direct prior experience, and we could encounter unanticipated problems, cost overruns or delays in opening studios in new markets or in the market acceptance of our studios. We will need to continue to improve our operating, administrative, financial and accounting systems and controls. We will also need to recruit, train and retain new yoga instructors, teacher trainers, studio and regional managers and other team members and maintain close coordination among our executive, accounting, finance, human resources, legal, marketing, sales and operations functions.

71. Those statements above were materially false and misleading because, as of the IPO, due to cost cutting, the Company was ***already*** incurring substantial overhead and studio-level expenses as a result of it backfilling management, staff and teacher positions, as alleged at ¶¶55-56. The Company's problems were not just a matter of future expansion, YogaWorks was already bleeding red ink as a result of its past and ongoing cost-cutting measures that were not revealed and the risks of which were materializing as of the IPO, as shown in the omitted net losses and Studio-Level profitability metrics.

72. Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503(c), requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and that each risk factor "adequately describes the risk."

73. The failure of the Registration Statement to disclose the alleged omitted facts above in ¶¶55-56, 59, 61, 63, 67, 69, 71 violated 17 C.F.R. §229.303(a)(3)(ii),

because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. §229.503(c), because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of YogaWorks speculative or risky.

## ADDITIONAL FACTS DEMONSTRATING THE OMITTED FACTS WOULD HAVE BEEN CONSIDERED SIGNIFICANT BY INVESTORS AND THAT THE SIGNIFICANCE OF INFORMATION LATER REVEALED BY THE COMPANY WAS OBSCURED BY ROSY ANALYST REPORTS AND COMPANY EARNINGS RELEASES

74. In addition to the nature of the omitted information alleged herein, the reactions of ordinary investors, independent analysts and the market, to revelations of previously omitted information, demonstrates materiality.

75. YogaWorks was promoted and propped up by a phalanx of securities analysts employed by the Underwriter Defendants. Analysts employed by every single Underwriter Defendant wrote positive analyst reports even as the Company reported negative financial results and the Company's stock price moved towards penny stock territory. Conference call attendance was also closely controlled and dominated by the analysts working for the Underwriter Defendants.

76. Just weeks after the IPO, on September 21, 2017, after the close of the market, YogaWorks announced its second quarter financial results for the period ending June 30, 2017. YogaWorks reported a net loss of $4.4 million, nearly double that of the same period of the previous year, Adjusted EBITDA losses over ten times greater than the same period of the previous year and Studio-Level EBITDA of $2.2 million as compared to $2.6 million for the same period of the previous year. Notably, YogaWorks blamed the decline in net revenue and other metrics (*e.g.*, studio visits) on the shift from monthly memberships to class packages, presented the results as "expected" and heralded its operations as a success.

77. In the earnings conference call, the CFO stated "increase in deferred revenue in the second quarter as compared to the same period last year was

principally due to a sales mix shift from monthly memberships towards class packages" and that "[a]s a result of this mix shift, student visits in the second quarter total almost 706,000 as compared to approximately 750,000 from the same period last year." As stated by the CFO, "[t]he decrease in visits was expected as students with class packages tend to visit less often than those with memberships," and that selling the class packages has only a "short-term impact on visits."

78. The CEO also presented the Company's results positively:

> Just two weeks following the IPO, we began executing our plan with the acquisition of two studios, including our first one in Virginia and one in Washington, D.C., which expanded our presence in the D.C. market. We are excited about welcoming these communities to the growing YogaWorks family and are currently in the middle of integrating these studios. We now have 52 studios in six regions and are the second largest operator of yoga studios in the country.
>
> Our market-leading position is due to a number of factors. First and foremost, our brand is known worldwide as a leading center of learning for yoga, and we operate one of the most respected training programs in the industry. We have graduated more than 11,000 alumni from our teacher training program over the last 27 years. Last year, we conducted 100 trainings in 18 countries. We believe this legacy of excellence in training has built our reputation to be larger than our studio footprint.
>
> Second, we are known for our broad range of yoga programming that appeals to people of all ages and abilities. And it enables us to deliver on our belief that yoga works for everybody. Our inclusive programming is paired with multiple pricing options to attract a broad range of students from casual yogis to the most dedicated practitioners. As of July 2016, students at all of our studios can select from a variety

of memberships or class packages so that they can find the best option for their practice and goal.

Third, to complement our in-studio offerings, we launched the myyogaworks.com on-demand video platform, which provides users access to high-quality yoga classes anytime, anywhere. For $15 or less per month, students have unlimited access to our library of over 1,000 videos to find the right class for their needs. Finally, we become the second largest operator of studios in the U.S. primarily through acquisitions. In fact, 32 of our 52 studios were acquired.

While we are highly selective in identifying prospective studios, our broad range of yoga programming allows us the flexibility to seamlessly acquire studios that teach nearly any style of yoga. Our integration approach is also important to our acquisition success. We maintain existing staff, teachers, and class schedules for continuity while also applying our best practices and operations in marketing to drive efficiency and result.

While these attributes have made us a market leader in the space, they've also solidified our position as acquirer of choice. In fact, studio owners welcome a conversation with us or seek us out when considering the sale of their studio. We are humbled by the trust that studio owners place in us to honor their legacy and help lead their studio to the next level approach.

Looking ahead, we are excited about our future and believe that we are uniquely positioned to gain market share within this growing and highly fragmented market. As we continue to expand nationally, our focus is on acquiring well-established studios with high-quality teachers and a vibrant community. Our goal is to welcome these studios

> into our family and work with local staff to grow the communities, leveraging our team and expertise.
>
> We have a robust acquisition pipeline which we have built through our focus on identifying the best possible partners in new and existing markets through disciplined selection criteria. As part of this process, we continue to meet owners across the country through both outbound efforts as well as inbound interest from studio owners, which has increased as a result of the exposure we've received since becoming a public company.

79. Analysts employed by Underwriter Defendants continued with "Buy" recommendations and price targets vastly exceeding the Company's trading price, and wrote positive reports. Cowen entitled its report "***Solid Progress as Acquisition Strategy Proceeds***," rated the Company "**OUTPERFORM (1)**" and set a price target nearly twice the last stock closing price.

> **The Cowen Insight**
>
> Sales attractively in-line w/pre-IPO flash guide, & Adj. EBITDA of -$551k vs. St. $-840k is better. We're most encouraged by: pipeline of acquisitions (10-13 in FY17), healthy gross margins of 61.5% & digital progress & opportunities; meanwhile, expected sales mix shift towards class packs is short-term revenue drag but better for long-term. Reit. Outperform on significant top-line growth oppty.

Guggenheim set the same price target and headlined their report "**The Secular Consolidation Story is Off To a Solid Start – Buy**."

> YOGA's first report as a public company was in line with expectations, with the all-important acquisition pipeline beginning to build. 2H 2017 guidance reflects a reacceleration in top-line momentum, largely driven by the expected acquisition of ten additional studios by year-end. We believe the company now has the capital, operational infrastructure, and

> integration playbook to double its network, to about 100 studios, by early 2019.

Roth Capital partners set the same price target and headlined their report "***Buy***," "**YOGA: Strong Deal Pipeline After In-Line 2Q**."

> Results and guidance met expectations and management noted strong pipeline backfill following its August acquisition of Tranquil Space. Yogaworks looks poised to continue capitalizing on growth in yoga participation and we see a significant opportunity to build on acquisition expertise to consolidate highly-fragmented studio market comprised of teacher-owners.

80. In its maiden quarter as a public company – a quarter that was half-way completed when YogaWorks closed its IPO, the Company reported more increased losses year-over-year. After the market's close on November 14, 2017, the Company reported a net loss of $4.6 million for the third quarter ended September 30, 2017, nearly ***twice*** that compared to the Company's net loss from the same period in 2016. Adjusted EBITDA significantly decreased to a ***negative*** $432,000 as compared with a ***positive*** $428,000 from the same period in 2016. Studio-Level EBITDA ***decreased*** approximately 10% year-over-year and adjusted net loss increased almost 40% year-over-year. Student visits declined year-over-year.

81. The Company again presented its results positively, with the CEO stating in the earnings conference call the following, among other things:

> Before we dive into our recent acquisitions, I'm happy to report that our third quarter results were at the high end of our expectations. Third quarter revenue of $13.5 million was slightly above our anticipated range and our adjusted EBITDA was at the high end of our guidance. Our results reflect solid performance in our base business with a very minor contribution from the three studios we acquired in Q3, two in late August and one at the end of September.

> We were pleased with our base business as revenue per visit increased, and while visits were down slightly as compared to last year, the third quarter was a significant improvement over the second quarter on a year-over-year basis. Specifically, in the second quarter, visits were down 6.5% year-over-year while, in the third quarter, visits decreased by only 2.5% year-over-year, and that excludes visits from acquired studios.
>
> As we've discussed in the past, the transition from our legacy membership-only model to also offering class packages in all studios has had the expected impact on visits as members tend to visit more frequently than class package holders. While this is having a short-term impact on visits, we are confident that offering class packages allow us the opportunity to broaden our student base over time.
>
> In fact, we saw an increase in unique visitors excluding visitors from acquired studios in the third quarter over the same period last year. Overall, our base business remains solid and our pricing strategy is in line with consumer demand.

82. With respect to acquisitions, the CEO stated, in part: "We remain very well positioned to execute our acquisition strategy given our 30-year heritage, our reputation for being the gold standard in teacher training and our strong record of successfully acquiring premier studios across the country."

83. Securities analysts employed by the Underwriter Defendants maintained "Buy" ratings with price targets nearly ***three times*** the YogaWorks trading price, and wrote positive reports. Guggenheim entitled its report "**YOGA – BUY – Acquisition Strategy Ahead of Plan, Base Business Improving**."

> YOGA remains in the early, but promising, stages of building a national fitness brand with the capability of healthy-secular top- and bottom-line growth. Most importantly, 16 new studios have been acquired since the

> August IPO, including the entrance to two new markets. On top of that, it continues to work through the addition of class package options in its base business, with the decline in visits moderating. As the company steadily progresses towards our estimated 200 studios and $125 million in revenue by 2020, it should begin to get credit for a higher level of sustainable adjusted EBITDA and the shares should be able to rally from current levels.

Roth Capital Partners headlined its report "***Buy***," "**YOGA: Deal Pipeline Builds After Strong 3Q**."

> Results and topline guidance exceeded expectations and management noted a growing acquisition pipeline even after several recent transactions. YogaWorks looks poised to continue capitalizing on growth in yoga participation and we see significant opportunity to consolidate a highly-fragmented studio market comprised of teacher-owners. Shares trade at a depressed valuation given the company's lack of profitability but we see YogaWorks beginning to leverage overhead by mid-next year and generating strong positive cash flow in 2019.

Cowen maintained its "**OUTPERFORM (1)**" rating and price target, and entitled its report "***Progress at the Core & With Acquisitions***."

> **The Cowen Insight**
>
> . . . **a YogaWorks National Footprint is Emerging**. Revenues encouragingly better on stronger base business & product mix; meanwhile, EBITDA was in-line given some negative margin mix impact from partner vs. own training programs. We're most encouraged by: solid base business w/increased unique visitor #'s, 16 acquisitions closed since IPO in August; 19 additional studios in late-stage negotiation.

Imperial Capital maintained its "Outperform" rating a stock price target nearly twice that of the trading price, and headlined its report "***3Q17 Shows Progress on Long-Term Goals – Maintaining Our Outperform Rating***."

> **Trends appear stable**. Same store visits, while still negative due to package/subscription changes made 2016, are normalizing versus recent quarters, and pricing remains healthy. Competitive dynamics remain stable.

84. On April 2, 2018, YogaWorks announced its financial results for the fourth quarter of 2017 and full year 2017 by filing a non-timely annual report on SEC Form 10-K, along with a Form 12b-25 indicating that YogaWorks was unable to timely file its annual report "due to a delay in finalizing a goodwill impairment charge related to the book value of the Company, relative to the Company's currently market capitalization." For 2017, YogaWorks recorded net revenue of $54.5 million (as compared to $55.1 million in 2016) and a net loss of $23.4 million – more than double the $9.5 million loss recorded in 2016. YogaWorks' hand-picked non-GAAP metric Studio-Level EBITDA also declined from $12.4 million to $10.7 million. YogaWorks also late recorded a goodwill impairment charge of $7.5 million, which represented over one-third of its' prior goodwill asset, "primarily due to projected cash flows and the Company's decline in market capitalization since the launch of the IPO."

85. Securities analysts employed by the Underwriter Defendants, acknowledged earnings measures were less than expected or flat, including EPS, Adjusted EBITDA and Studio-Level EBITDA and Studio-Level EBITDA margin, but nonetheless maintained positive ratings with price targets nearly ***two to three times*** the YogaWorks' trading price. Guggenheim maintained its "BUY" rating and although it lowered its price target, the price target was still more than two times the Company's current stock price. The report headline read "**YOGA – BUY – Shift to**

**Organic Guidance Sets a Lower Bar, Making Progress Building Brand – Lowering PT**."

> **Key Message:** YOGA's growth-by-acquisition story is making progress with 16 studios acquired in the past three quarters, including entries into Houston and Atlanta. We remain intrigued by the potential to build an industry-leading brand in a large, growing market . . . . We continue to see upside from current levels and retain our Buy rating.

Cowen maintained its "**OUTPERFORM (1)**" rating and price target, and entitled its report "**HEALTHY BASE, SUBSTANTIAL NATIONAL OPPORTUNITY AHEAD**."

> **The Cowen Insight**
>
> **Continued Execution Will Drive Consistent Growth**. YOGA's 4Q revenues in-line with Street and guidance, and unique visit trend continues to be positive, +4% in the quarter. Looking forward, acquisitions are not contemplated in guidance, though strategy is firmly intact, and pipeline is attractively robust.

Imperial Capital maintained its "Outperform" rating a stock price target almost twice that of the trading price, and headlined its report "**4Q17 Results Relatively Consistent With Expectations – Maintaining Our Outperform Rating and $5 Price Target**." It's report stated:

> While admittedly still early, in our view, YOGA's 4Q17 results showed progress as the company works to leverage its brand and legacy studio base into a nationwide brand. We believe the risk/reward profile is favorable.

Roth Capital Partners headlined its report "***Buy***," "**YOGA: Revising Estimates to Exclude Future Acquisitions, Following In-Line 4Q17**."

> We updated estimates following in-line 4Q17 results and management's decision to no longer include acquisitions in its official

> guidance. We view management's decision positively, since shares trade at a depressed valuation and seemingly reflect limited benefits from deals and the potential for significant leveraging of overhead. We reiterate our Buy, as YogaWorks looks poised to continue capitalizing on growth in yoga participation and the opportunity to consolidate a highly-fragmented studio market.

86. YogaWorks' stock price fell from an open of $2.94 per share on April 2, 2018 to a close of $2.35 per share on April 3, 2018, a 20% decline on heavy trading volume, nearly 60% below the IPO price.

87. On August 14, 2018, YogaWorks announced its financial results for the second quarter of 2018. YogaWorks reported significantly increased net losses – ***50% more losses*** – over the same period the prior year (***negative*** $6.7 million from ***negative*** $4.4 million), nearly ***three times*** the loss in Adjusted EBITDA from the same period prior (***negative*** $1.4 million from ***negative*** $551 thousand), and flat Studio-Level EBITDA compared to the same period the prior year. Making matters worse, YogaWorks again recorded a goodwill impairment during the second quarter of 2018, recording an additional $2.5 million impairment for the quarter. Unable to credibly deflect lower studio visits and revenue on a "sales mix shift," which the Company said was "short-term," the Company was forced to admit financial performance of its existing studios was not satisfactory. The Company also admitted fewer promotions had a negative effect on the performance of its existing studios, meaning promotions had previously masked base business performance. And having cut salaries, replaced management and backfilled positions with less qualified and lower paid personnel, which in part drove declining customer experience and class quality, the Company reported it would need to increase corporate expenses with training and brand building initiative.

88. As the CEO stated on the earnings call:

***[W]e did not see the higher-than-expected revenue flow through to EBITDA margin in the second quarter due largely to decrease in base studio four-wall margin as a result of certain studios underperforming versus last year***, as well as the introduction of new classes that generated low margins until awareness builds and attendance ramps up. Vance will provide more details on our financial performance shortly.

Looking at visit trends in the second quarter, total visits increased 23% due to the addition of 21 studios last year. However, the continued mix shift between membership and class packs, as well as fewer promotions relative to last year, resulted in a ***2% decline in visits on a same-store basis***. This, however, represents a sequential improvement over the 4% decline we saw in Q1. Overall, we remain intently focused on driving growth in revenue and visits in our base business, which I will speak to shortly.

We also saw a 24% increase in overall unique visitors due to the higher studio count and a 1% increase in unique visitors on a pro forma same-store basis, further validating our widening appeal with our more flexible pricing options. ***Overall, while our revenue came in ahead of our expectations, we're not satisfied with the performance of our base business.***

***As we said from the beginning, we look to flat to modest sales growth in our base business at a stable EBITDA margin rate. However, our base business is not currently delivering on this expectation.*** As a result, we are making it our number one priority to take steps to drive both visits and profitability in these studios. We are confident that the actions we are taking will enable us to drive healthier revenue growth at improved margins.

89. The CFO also admitted that the "decrease in studio-level EBITDA margin was primarily due to challenging same-stores visits."

90. YogaWorks' stock price fell from $1.86 to close at $1.09 per share, an additional 41%, on August 15, 2018.

91. With YogaWorks approaching penny stock territory, a fraction of their price targets, securities analysts employed by the Underwriter Defendants began to downgrade their ratings and label their price targets "NA." On August 15, 2018, before the open of the market, Guggenheim wrote "We Move to NEUTRAL on Base Business Challenges." "2Q operating results were a mixed bag . . . revenue upside did not flow through to the bottom line." For the first time these analysts found that existing studio results were "deteriorating," meaning that YogaWorks was not "preserving" the "appeal" of studios it acquired – a key aspect of the Company's business model. The next day Stephens wrote "[g]ross margin was meaningfully lower than expected . . . company modestly raised its FY18 revenue guidance, but meaningfully lowered its adj. EBITDA guidance." On that same day, Roth reduced its target price and, like Guggenheim, for the first time suggested the Company's business strategy was faltering with the observation of "underperformance in the company's base business" and the "addition of new classes but limited summer attendance." And Cowen downgraded with a headline of "Recommend Moving to Sidelines," stating "margins are also expected to contract – reflected in the lowered FY18 EBITDA guidance."

92. Gary Alexander, providing analysis for Seeking Alpha, on August 19, 2018, wrote a report entitled: "YogaWorks: Pushing Into Penny Stock Territory."

> The company's adjusted EBITDA sank this quarter despite the higher studio count, ***raising the question of whether YogaWorks' business model is even viable***.
>
> Drilling down into the studio metrics raised some additional red flags. The company's CEO noted that YogaWorks tried to implement

> new classes to encourage more frequent attendance, but overall margins were low. In addition, same-store visits (similar to same store sales metrics at retail companies, which measures only the locations that have been open for more than one year) declined -2% y/y.
>
> Partly as a result of poor visitation metrics, YogaWorks' revenue per studio (and profitability) has sagged. You'll note that despite having a much larger studio count versus 2Q17, YogaWorks' per-studio revenues have declined.
>
> * * *
>
> Studio-level EBITDA margins sank to 14.9%, 200 bps worse than 16.9% in the year-ago quarter. YogaWorks' CFO blamed the declining studio EBITDA margin on 'challenging same-store visits, higher rent and payroll costs for new and base studios,' as well as new classes which result in lower classes until they are built out. Absolute adjusted EBITDA, on the other hand, magnified losses to -$1.4 million, or a -9.2% margin that is 490 bps worse than -4.3% in 2Q17.

93. Raising the specter of liquidity, he concluded:

> [T]here's only $15.5 million of cash remaining to support YogaWorks' spending spree. If YogaWorks' current cash burn run rate holds, it has barely over a year left of operations before it has to raise additional capital. With shares trading near pink-sheet territory, raising equity capital seems to be out of the question. On the credit side, only the riskiest of venture-debt lenders would want to lend to an unprofitable company like this - and even if YogaWorks were able to pull that off, it would come at a crippling interest rate. . . . In my view, this company is headed into the ground.

Emphasis added.

94. On December 12, 2018, YogaWorks filed a Form 8-K with the SEC, announcing that on December 6, 2018 it received a letter from NASDAQ stating that the market value of the publicly held shares of YogaWorks for the prior 30 business days fell below the exchange's $5 million minimum value and thus, YogaWorks was subject to delisting if it was unable to regain compliance. YogaWorks then received another similar letter from NASDAQ on December 12, 2018 for its noncompliance with NASDAQ's $1.00 minimum share price requirement.

95. Within one year of the IPO, the Company was a penny stock. On July 25, 2019, the Company delisted its stock from the NASDAQ. On August 1, 2019, NASDAQ permanently suspended trading of the Company's common stock. And on August 5, 2019, the Company filed SEC Form 15 giving notice that it was terminating registration and suspending its duty to file reports under federal securities laws.

96. At the time of the filing of this action, YogaWorks' stock traded at $0.44 or 92% below the IPO price. As shown below, YogaWork's trading price plummeted below comparable market and industry indices in response to the revelation of previously omitted negative company-specific information, showing investors considered the information important.




## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

97. Lead Plaintiff brings this action as a class action on behalf of all those who purchased or otherwise acquired YogaWorks common stock in the IPO, or pursuant and/or traceable to the Company's Registration Statement issued in connection with the IPO, and who were damaged thereby. Excluded from the Class are defendants and their families, the officers, directors and affiliates of defendants, at all relevant times, members of the defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

98. The members of the Class are so numerous that joinder of all members is impracticable. There were 7.3 million shares sold in the IPO. Since the IPO, the Company's common stock has actively traded on NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be

ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by YogaWorks or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

99. Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

100. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

101. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

102. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the 1933 Act was violated by defendants as alleged herein;

(b) Whether the Registration Statement contained material misstatements, materially misleading statements and/or omitted material information required to be stated therein;

(c) Whether certain defendants controlled primary violators within the meaning of the 1933 Act; and

(d) The extent to which members of the Class have sustained damages and the proper measure of damages.

103. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 11 of the 1933 Act Against All Defendants Except Great Hill Partners

104. Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

105. This Cause of Action is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants. This is a non-fraud cause of action. Lead Plaintiff does not assert that defendants committed intentional or reckless misconduct or that defendants acted with scienter or fraudulent intent.

106. The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

107. Defendants are strictly liable to Lead Plaintiff and the Class for the misstatements and omissions.

108. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

109. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated §11 of the 1933 Act.

110. Lead Plaintiff acquired YogaWorks common stock pursuant and/or traceable to the Registration Statement for the IPO.

111. Lead Plaintiff and the Class have sustained damages pursuant to §11(e) of the 1933 Act. In addition, as a result of the materially misleading Registration Statement, YogaWorks' share price was inflated at the time of the IPO through which YogaWorks raised approximately $40.15 million in gross proceeds.

112. At the time of the purchase of YogaWorks common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the initiation of this lawsuit. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the common stock upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

**COUNT II**

**Violation of Section 12(a)(2) of the 1933 Act Against the Company, the Executive Defendants, and the Underwriter Defendants**

113. Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

114. This Cause of Action is brought pursuant to §12(a)(2) of the 1933 Act, 15 U.S.C. §771(a)(2), on behalf of the Class, against the Company, the Executive Defendant and the Underwriter Defendants.

115. This Cause of Action does not sound in fraud. Lead Plaintiff does not allege that the Company, the Executive Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

116. By means of the defective Prospectus and other conduct alleged herein, including oral and written communications made by the Company, the Executive

Defendants and Underwriter Defendants in connection with the Company's road show, defendants promoted and sold YogaWorks stock to Lead Plaintiff and other members of the Class, for defendants' own financial benefit and the financial benefit of their associates. The Underwriter Defendants additionally solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase shares in the IPO. Lead Plaintiff was solicited by at least one member of the underwriting syndicate, defendant Stephens Inc., and purchased from that Underwriter Defendant.

117. The Prospectus and road show communications contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Defendants owed Lead Plaintiff, and the other members of the Class who purchased YogaWorks common stock pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

118. Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Lead Plaintiff have known, of the untruths and omissions contained in the Prospectus, at the time Lead Plaintiff acquired YogaWorks common stock.

119. By reason of the conduct alleged herein, defendants named herein violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Lead Plaintiff and the other members of the Class who purchased YogaWorks common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of stock. Accordingly, Lead Plaintiff and the other members of the Class who purchased YogaWorks common stock issued pursuant to the Prospectus seek damages to the extent permitted by law or seek to

rescind and recover the consideration paid for their shares, and hereby tender their common stock to the defendants sued herein.

120. This Action is brought within three years from the time that the common stock upon this Count is brought were sold to the public, and within one year from the time when Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

**COUNT III**

**Violation of Section 15 of the 1933 Act**
**Against the Individual Defendants and Great Hill Partners Defendants**

121. Lead Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

122. This Cause of Action is brought pursuant to §15 of the 1933 Act against the Individual Defendants and the Great Hill Partners defendants.

123. The Individual Defendants each were control persons of YogaWorks by virtue of their positions as directors and/or senior officers of YogaWorks as of the IPO. The Great Hill Partners defendants each had the ability to influence the policies and management of YogaWorks by their voting and dispositive control over YogaWorks at all relevant times by common stock ownership, pre-IPO agreements and by having their designated directors serving on the board of YogaWorks. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of YogaWorks. The Great Hill Partners defendants were not only control persons of YogaWorks by virtue of their ownership of YogaWorks common stock, Board membership, "services" provided YogaWorks, relationships with management and involvement in establishing YogaWorks' management and board, they also had extensive contractual rights regarding YogaWorks' governance, capitalization and ability to finance, including, but not limited to, rights to cause the IPO.

124. The Great Hill Partners defendants had a financial interest in taking the Company's stock public in order to increase the holding value and marketability of their investment. Defendant YogaWorks, the Great Hill Partners defendants and the Individual Defendants were each critical to effecting the IPO, based on their signing or authorization of the signing of the Registration Statement, by voting (including voting their shares) to execute the IPO and by having otherwise directed through their authority the processes leading to execution of the IPO, including obtaining the Underwriter Defendants, registration, qualification, authorization, pricing, offering to the public and issuance and sale of the shares in the IPO.

125. By virtue of the conduct alleged herein, the defendants named in this Cause of Action are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiff and the Class for damages suffered.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding rescission or a rescissory measure of damages to the extent permitted under the claims asserted herein;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Awarding such equitable/injunctive or other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED: January 14, 2020

ROBBINS GELLER RUDMAN & DOWD LLP
JAMES I. JACONETTE

JAMES I. JACONETTE

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 14, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ James I. Jaconette
JAMES I.JACONETTE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: JamesJ@rgrdlaw.com

# Mailing Information for a Case 2:18-cv-10696-CJC-SK Craig Cohen v. YogaWorks, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Patrick V Dahlstrom**
  pdahlstrom@pomlaw.com
- **Meryn C N Grant**
  meryn.grant@lw.com
- **Joshua G Hamilton**
  joshua.hamilton@lw.com,shirin.behrooz@lw.com,sandra.sudduth@lw.com,joshua-hamilton-8581@ecf.pacerpro.com
- **Setareh Homayoni**
  setareh.homayoni@lw.com
- **James I Jaconette**
  jamesj@rgrdlaw.com,DawnC@rgrdlaw.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis@rgrdlaw.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com
- **Brian Oliver O'Mara**
  bomara@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,kmsaletto@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com
- **John Warren Rissier**
  warren.rissier@morganlewis.com,bernice.worley@morganlewis.com
- **Laurence M Rosen**
  lrosen@rosenlegal.com
- **Juan Carlos Sanchez**
  jsanchez@rgrdlaw.com
- **Charlene Sachi Shimada**
  charlene.shimada@morganlewis.com
- **Lucy Han Wang**
  lucy.wang@morganlewis.com,margaret.thomasian@morganlewis.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)